923 F.2d 934
 32 Fed. R. Evid. Serv. 1296
 UNITED STATES of America, Appellee,
v.
Alex SIMMONS, a/k/a "Yaqui," Robert Cofer, Arnold Lawson,
a/k/a "Country Bones," Larry Caldwell, Miriam Baker, Barry
Judd, a/k/a "Box," William Norris, a/k/a "El San," Gary
Simmons, a/k/a "Merciful," a/k/a "Merc," Lawrence Williams,
a/k/a "Hammy Red," Steven Monsanto, a/k/a "Stevie," a/k/a
"Fats," Peter Monsanto, a/k/a "PJ," a/k/a "Petey," Sedgwick
Harvey, a/k/a "Uncle Harvey," Defendants-Appellants.
 Nos. 473 to 484, Dockets 88-1504 to 88-1507, 88-1512,
88-1521 to 88-1525, 88-1529 and 88-1545.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1990.
Decided Jan. 11, 1991.
As Amended Feb. 20, 1991.
 
 Barry M. Fallick, New York City (Rochman, Platzer & Fallick, of counsel), for defendant-appellant Alex Simmons.
 Bobbi C. Sternheim, New York City, for defendant-appellant Robert Cofer.
 David Gordon, New York City, for defendant-appellant Arnold Lawson.
 Philip Katowitz, New York City, for defendant-appellant Larry Caldwell.
 Larry Caldwell, Lompoc, Cal., pro se.
 Charles Adler, New York City (Goltzer & Adler, of counsel), for defendant-appellant Miriam Baker.
 Howard Mullholland, New York City, for defendant-appellant Barry Judd.
 Marion A. Seltzer, New York City, for defendant-appellant William Norris.
 Frederick H. Block, New York City, for defendant-appellant Gary Simmons.
 Oscar Holt, New York City (Wiggins, Holt & Garnett, of counsel), for defendant-appellant Lawrence Williams.
 Martin Goldberg, Franklin Square, N.Y., for defendant-appellant Steven Monsanto.
 David L. Lewis, New York City, for defendant-appellant Peter Monsanto.
 Philip R. Edelbaum, New York City, for defendant-appellant Sedgwick Harvey.
 Annmarie Levins, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Howard E. Heiss, Daniel A. Nardello, Daniel C. Richman, Linda C. Severin and David E. Brodsky, Asst. U.S. Attys., of counsel), for appellee.
 Before OAKES, Chief Judge, MESKILL, Circuit Judge, and RESTANI, Judge.*
 OAKES, Chief Judge:
 
 
 1
 This appeal continues several years of protracted litigation, which originated as a six-month narcotics, RICO and conspiracy trial of seventeen defendants, and which along the way has produced a panel, an en banc and a Supreme Court decision regarding the constitutionality of the federal criminal forfeiture statute, 21 U.S.C. Sec. 853 (1988). See United States v. Monsanto, 836 F.2d 74 (2d Cir.1987), vacated, 852 F.2d 1400 (2d Cir.1988) (en banc), rev'd, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989).
 
 
 2
 Appellants were originally indicted and convicted for participating in a vast wholesale and retail heroin distribution network that operated from Boston to Washington, D.C. On this occasion, we affirm those convictions.
 
 BACKGROUND
 I. The Indictments
 
 3
 Peter Monsanto, Alex Simmons, Robert Cofer, Arnold Lawson, Larry Caldwell, Miriam Baker, Barry Judd, William Norris, Gary Simmons, Lawrence Williams, Steven Monsanto, and Sedgwick Harvey (collectively known as the "Monsanto Crew") appeal from judgments of conviction in the United States District Court for the Southern District of New York, Robert J. Ward, Judge, after a six-month jury trial that ended on July 25, 1988.
 
 
 4
 Appellants were convicted on all twenty-four counts alleged in Indictment S 87 Cr. 555, which was filed on October 17, 1987.[1] Counts One and Two charged appellants with participating in and conspiring to participate in the affairs of a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Secs. 1961-1968 (1988). These counts detailed eighteen acts of racketeering activity, including murder, conspiracy to murder, heroin trafficking and conspiracy to distribute heroin. While all appellants were not indicted for every racketeering act, each was alleged to have participated in at least two acts of racketeering activity. Racketeering Act # 1 charged Peter Monsanto, Gary Simmons, Robert Cofer and Arnold Lawson with conspiracy to murder and with the murder of Bobby Walker, a former member of the Monsanto Crew. Racketeering Act # 2 charged Peter Monsanto, Robert Cofer, Larry Caldwell, Arnold Lawson, Gary Simmons, Alex Simmons and William Norris with conspiracy to murder three individuals who allegedly had attacked Peter Monsanto's wife. Racketeering Acts # 3-4 charged Peter Monsanto, Robert Cofer, Gary Simmons, Alex Simmons and Arnold Lawson with the murders of William Graham and Billy Shuff. Racketeering Act # 5 charged all appellants with conspiracy to distribute heroin. Racketeering Acts # 6-18 charged all appellants with either possession of heroin with intent to distribute or distribution of heroin.
 
 
 5
 Count Three charged all appellants with participating in a narcotics conspiracy, in violation of 21 U.S.C. Sec. 846 (1988). Count Four charged Peter Monsanto with operating a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848 (1988). Counts Five and Six charged Gary Simmons and Sedgwick Harvey with distribution of heroin, in violation of 21 U.S.C. Sec. 841(b)(1)(B) (1988). Counts Seven through Twelve charged Peter Monsanto with unlawful possession of firearms, in violation of 18 U.S.C. Appendix, Sec. 1202(a) (1982) (repealed 1986). Counts Thirteen through Seventeen charged Gary Simmons, Alex Simmons and William Norris with weapons offenses in violation of the same statute. Counts Eighteen through Twenty-One charged Peter Monsanto with federal income tax evasion, in violation of 26 U.S.C. Sec. 7201 (1988). Counts Twenty-Two through Twenty-Four charged that certain property owned by Peter Monsanto was subject to criminal forfeiture under 21 U.S.C. Sec. 853(a) (1988).
 
 II. Factual History
 
 6
 This case involves the affairs of a heroin distribution network that functioned from 1981 until its demise in 1986, and that has become known as the Monsanto Crew. During those five years, the Monsanto Crew sold massive amounts of heroin in New York City and numerous other locations throughout the northeastern United States by means of a complicated wholesale and retail distribution network. According to the Government's evidence, the network functioned roughly in the following manner: Peter Monsanto, the recognized leader of the Crew, would initially purchase bulk quantities of heroin from wholesale distributors and transfer the supply to heroin mills, where it would be packaged in "quarter bags" (valued at approximately $30 each). After packaging, Peter Monsanto would provide the quarter bags on consignment to his "lieutenants," each of whom operated a separate, semi-autonomous distribution network. Ultimately, each lieutenant would oversee the sale of the heroin on the street, and return the money received to Peter Monsanto. The Government contends that Robert Cofer, Gary Simmons, Alex Simmons, William Norris, Arnold Lawson, Larry Caldwell, Lawrence Williams, Sedgwick Harvey and Barry Judd were lieutenants in the Monsanto Crew.
 
 
 7
 Steven Monsanto and Miriam Baker, the two appellants who did not function as lieutenants in the Monsanto Crew, performed other important duties in the operation. Steven Monsanto, who was serving a thirty-year sentence in a federal penitentiary for an unrelated 1978 heroin conviction during the period in question, helped secure heroin for the operation by arranging meetings between members of the Monsanto Crew and other heroin suppliers. Miriam Baker, the mother of Peter and Steven Monsanto, distributed heroin to other members of the Crew, assisted Peter Monsanto in thwarting investigations into his criminal activities, and aided in securing sources of heroin supply.
 
 
 8
 Peter Monsanto met with his lieutenants on virtually a daily basis at the Crew's headquarters, originally located at "Lisa's," a restaurant on Boston Post Road in the Bronx. When Lisa's closed down in June 1984, the daily meetings shifted to the Crew's new headquarters, a restaurant known as "New Lisa's," also located in the Bronx. It was at these locations that Peter Monsanto would distribute heroin, collect money due on previous consignments, and discuss the business of the enterprise. Meetings also took place at other venues, including the apartment of one of Peter Monsanto's girlfriends and "Jack Girl's Famous Soul Food Restaurant," on Morris Avenue in the Bronx.
 
 
 9
 The Monsanto Crew was an extremely violent group that consistently used fierce tactics to secure its position in the heroin business and to enforce discipline within its own ranks. Evidence of two incidents demonstrated these violent tendencies. The first, alleged in the indictment as Racketeering Act # 1, concerned the murder of Bobby Walker, who previously had functioned as a lieutenant in the Monsanto Crew. By the end of 1982, Walker and his partner owed Peter Monsanto more than $70,000. On April 15, 1983, Peter Monsanto, Arnold Lawson, Robert Cofer and Gary Simmons confronted Walker about this debt in Lisa's Restaurant. In the ensuing exchange, Walker supposedly "said something stupid" and was summarily stabbed and shot to death by members of the Crew. His body was then removed from the restaurant and disposed of in a U-Haul truck in a deserted section of the Bronx.
 
 
 10
 The second incident, alleged as Racketeering Acts # 2-4, concerned the conspiracy to murder and murder of three individuals who previously had attacked Peter Monsanto's wife, Jacqueline Monsanto. On January 16, 1984, Jacqueline Monsanto and a friend were shot in a hallway of a Bronx apartment building during the course of an unrelated narcotics transaction. The Monsanto Crew organized the next day at Lisa's restaurant, where Peter Monsanto explained that three individuals--Martin Pitt, Vincent Reynard and William Graham--were responsible for the attack on his wife and that the heroin supply would cease until the three perpetrators had been caught. Thereafter, Peter Monsanto, Robert Cofer, Larry Caldwell, Arnold Lawson, Gary Simmons, Alex Simmons and William Norris, as well as other members of the Crew, left the restaurant and unsuccessfully attempted to apprehend William Graham at his residence.
 
 
 11
 An extensive search for the three perpetrators ensued. During this time, William Graham learned that members of the Monsanto Crew were looking for him. Accompanied by his brother Billy Shuff, Graham confronted Alex Simmons about the incident. Alex Simmons, in turn, brought Graham and Shuff to a restaurant in the Bronx where Peter Monsanto, Robert Cofer, Arnold Lawson, Gary Simmons, and Eddie Simmons had assembled. After a witness identified Graham as one of Peter Monsanto's wife's attackers, the Crew brought Graham and Shuff a short distance from the restaurant, and shot them to death.
 
 
 12
 Over one hundred witnesses testified during the six-month trial. The Government called over eighty witnesses, many of whom were former members of the Monsanto Crew. Of these witnesses, by far the most important was Steven McGauley, a former lieutenant in the Monsanto Crew who testified about various members' involvement in the murders of Bobby Walker, William Graham and Billy Shuff. McGauley also testified extensively about the details of the Crew's heroin operations. The defense presented twenty-eight witnesses of its own, many of whom were called to discredit the testimony of the Government's witnesses. In particular, many of the defense witnesses attempted to undermine Steven McGauley's credibility.
 
 
 13
 With this brief description of the criminal activities of the Monsanto Crew, we now turn to appellants' numerous challenges to their convictions.
 
 DISCUSSION
 I. District Court's Evidentiary Rulings
 
 14
 A. Steven McGauley's State Grand Jury Testimony
 
 
 15
 Appellants argue that the district court's admission of that part of Steven McGauley's 1986 state grand jury testimony concerning the murders of William Graham and Billy Shuff constitutes reversible error. The Government responds that the testimony was properly admitted and that the resulting error, if any, was harmless. Although the disposition of this matter was far from perfect, we agree with the Government that any resulting error was harmless.
 
 
 16
 The circumstances giving rise to this complicated evidentiary issue center around a 1986 New York State grand jury investigation into the murders of Bobby Walker, William Graham, and Billy Shuff. During that investigation, Assistant District Attorney Lawrence Lebowitz examined Steven McGauley about the three murders. On June 19, 1986, the state grand jury indicted Peter Monsanto, Robert Cofer and Gary Simmons for the Walker murder. The next day, Peter Monsanto, Robert Cofer, Alex Simmons and two others were indicted for the murders of Graham and Shuff. Ultimately, both indictments were dropped after the initiation of the federal prosecution.
 
 
 17
 On May 26, 1988, defense counsel for Arnold Lawson called Lebowitz to the stand in the present action and questioned him about his 1986 state grand jury examination of McGauley. This inquiry was limited to facts concerning McGauley's state grand jury testimony about the Walker murder. Thereafter, the Government attempted to introduce McGauley's full state grand jury testimony, including those portions that related to the Graham-Shuff murders. The district court refused the proffer on the ground that the full transcript of McGauley's state grand jury testimony exceeded the scope of the direct and cross-examination of Lebowitz. Instead, the district court admitted the exhibit on the condition that the Government redact it to equate to the scope of counsel's examination. From review of the transcript, this redaction order required the deletion of all references to the murders of Graham and Shuff.[2]
 
 
 18
 The matter did not again resurface until July 17, 1988, when the jury, during its deliberations, requested those portions of McGauley's state grand jury testimony that specifically referred to Racketeering Acts # 3-4 (the Graham-Shuff murders). At that time, as everyone had overlooked, the Government had yet to redact the testimony in accordance with the district court's May 26 admissibility ruling. The district court proceeded to hold an extended hearing to determine whether the requested portions of the testimony should be published to the jury. After the parley, the court decided to admit those portions under Fed.R.Evid. 801(d)(1)(B), as prior consistent statements offered to rebut allegations of recent fabrication.[3] According to the district court, this new basis to admit the evidence arose after the defense's extensive attacks on McGauley's credibility. The defense strongly objected to the district court's ruling on the grounds that only those portions of the testimony referring to the Walker murder had been admitted, that the Government had failed to comply with the previous redaction order, and that it was improper to admit evidence after the close of trial.
 
 
 19
 Our first task is to assess the constitutional implications of the district court's July 17 admissibility ruling. The Sixth Amendment, of course, guarantees an accused the right to a trial by jury. The Supreme Court, in evaluating the nature and extent of this right, has stated: "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). The corollary of this notion is that facts that relate to a defendant's guilt, but which are not admitted as evidence during trial, should not be exposed to a jury during deliberations. Any other conclusion would permit a jury to consider incriminating evidence that has not been subject to confrontation or cross-examination, in direct contravention of the Sixth Amendment's guarantees. See, e.g., Lacy v. Gardino, 791 F.2d 980, 983 (1st Cir.) ("Jury exposure to facts not admitted during trial violates the sixth amendment right to trial by jury by permitting evidence to reach the jury which has not been subjected to confrontation or cross-examination."), cert. denied, 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986); Gibson v. Clanon, 633 F.2d 851, 854 (9th Cir.1980) ("[W]hen a jury considers facts that have not been introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence."), cert. denied, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). On more than one occasion, we have noted that the Sixth Amendment protects against extra-record infiltration of jury deliberations. See Bulger v. McClay, 575 F.2d 407, 411 (2d Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978); Owen v. McMann, 435 F.2d 813, 816 (2d Cir.1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971).[4]
 
 
 20
 Here, it is possible in the abstract that the district court's decision not to redact the disputed testimony after the close of evidence denied appellants the opportunity to confront the evidence against them. Again, appellants may have been prevented from exposing any inconsistencies that may have existed between McGauley's state grand jury testimony and his in-court testimony about the Graham-Shuff murders. In addition, appellants were unable to introduce evidence that may have rebutted the disputed portions of McGauley's state grand jury testimony, though that testimony paralleled his testimony at trial. Those appellants who were not indicted by the state grand jury for the Graham-Shuff murders argue that, had they been given the opportunity, they would at least have alerted the jury to that fact.
 
 
 21
 However, we need not determine whether appellants' Sixth Amendment rights were violated because we conclude that any such violation was harmless. Initially, we note that constitutional errors are reviewed according to their severity. On the one hand, certain constitutional errors "are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); see, e.g., Rose v. Clark, 478 U.S. 570, 577, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986) (listing examples of constitutional error that require automatic reversal). On the other hand, some constitutional errors are "so unimportant and insignificant" to the factfinding process that they do not require automatic reversal. See Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Instead, such errors are reviewed case-by-case to determine if reversal is required. See Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436. Under this well-established harmless error rule, a conviction will not be set aside if "the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Id. Sixth Amendment violations, such as those that may have occurred in this case, are reviewable under this standard. See id. at 684, 106 S.Ct. at 1438 (Confrontation Clause errors); Jones v. Berry, 880 F.2d 670, 672-73 (2d Cir.1989) (improper curtailment of cross-examination); United States v. Towne, 870 F.2d 880, 886-87 (2d Cir.) (same), cert. denied, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); Lacy v. Gardino, 791 F.2d 980, 983 (1st Cir.) (extra-record infiltration), cert. denied, 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986).
 
 
 22
 Applying the harmless error standard here, we conclude beyond a reasonable doubt that the district court's admission of the disputed testimony did not cause appellants any actual prejudice. We draw this conclusion for several reasons. Most important, McGauley's in-court testimony concerning the murders of Graham and Shuff was virtually identical to his state grand jury testimony in every respect. As a result, the jury learned nothing new about appellants' guilt from the district court's decision not to redact the disputed testimony. In the end, the cumulative nature of the extra-record infiltration undermined its prejudicial impact. See United States v. Weiss, 752 F.2d 777, 783 (2d Cir.) (holding that a court may conclude that extra-record information is non-prejudicial when abundance of properly admitted evidence relevant to the matter exists), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir.) (same), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); Sher v. Stoughton, 666 F.2d 791, 794 (2d Cir.1981) (same). In addition, appellants' claim of prejudice because they were prevented from exposing inconsistencies between McGauley's state grand jury testimony and his in-court testimony concerning the Graham-Shuff murders is unpersuasive. McGauley was the Government's main witness. He testified extensively about the Graham-Shuff murders, the Bobby Walker murder, and various other aspects of the Monsanto Crew's narcotics operations. Throughout the trial, the defense extensively attacked McGauley's credibility by highlighting numerous inconsistencies in his testimony, arguing that he fabricated testimony in exchange for benefits from the Government, and presenting rebuttal witnesses to contradict his testimony. Given these extensive attacks on McGauley's credibility, it is highly unlikely that the jury would have decided not to credit him as a witness simply because of any additional inconsistencies the defense may have been able to expose in his grand jury testimony about the Graham and Shuff murders. Finally, even assuming that appellants were prejudiced by the district court decision, there still would be no basis to reverse any conviction. The RICO and RICO conspiracy counts of the indictment were supported by eighteen acts of racketeering activity. According to the verdict sheet, the jury found that each appellant committed, in addition to Racketeering Acts # 2-4 (the only acts affected by the Graham-Shuff murders), at least two other acts of racketeering activity. Under these circumstances, the untainted evidence was sufficient to support the RICO and RICO conspiracy convictions. See 18 U.S.C. Sec. 1961(5) (" '[P]attern of racketeering activity' requires at least two acts of racketeering activity.").
 
 
 23
 B. Steven McGauley's Co-Conspirator Testimony
 
 
 24
 Steven McGauley testified that he had numerous conversations with Peter Monsanto, Arnold Lawson, Gary Simmons and Robert Cofer, in which those appellants acknowledged their participation in the murder of Bobby Walker. McGauley also testified that he discussed the Walker murder with other members of the Monsanto Crew who were in debt to Peter Monsanto. The district court admitted McGauley's testimony under Fed.R.Evid. 801(d)(2)(E), as statements made by co-conspirators in furtherance of a conspiracy. Appellants challenge this ruling on the ground that McGauley's testimony was inadmissible hearsay. We find no merit to this claim.
 
 
 25
 Co-conspirator statements are admissible against all members of a conspiracy if made "in furtherance" of that conspiracy. Fed.R.Evid. 801(d)(2)(E). While idle chatter between co-conspirators does not further a conspiracy, see United States v. Paone, 782 F.2d 386, 390 (2d Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), we have recognized that " '[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of [a] conspiracy.' " United States v. Rahme, 813 F.2d 31, 35-36 (2d Cir.1987) (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)). In addition, statements designed to induce a listener's assistance satisfy the requirements of Fed.R.Evid. 801(d)(2)(E). See Rahme, 813 F.2d at 36; Paone, 782 F.2d at 391. Because what constitutes a statement that is "in furtherance" of a conspiracy is essentially a question of fact, we will reverse a decision to admit co-conspirator statements only if it is clearly erroneous. See Rahme, 813 F.2d at 36.
 
 
 26
 Here, we find no basis to disturb the district court's conclusion that McGauley's conversations about the Walker murder were statements made in furtherance of a conspiracy. The co-conspirators' discussions of Walker's brutal murder, and the reasons for it, may well have served to promote the criminal activities of the Monsanto Crew by enforcing discipline among its members. If nothing else, the story of Walker's murder warned members of the Crew that a similar fate awaited those who failed to follow Peter Monsanto's orders. Because these statements may have promoted cohesiveness among the Crew and helped induce Crew member assistance in the affairs of the criminal enterprise, the district court did not abuse its discretion in admitting the disputed testimony.
 
 
 27
 C. DEA Agent Charles Howard's Expert Testimony
 
 
 28
 During its case-in-chief, the Government called DEA Agent Charles Howard to provide expert testimony about the meaning of various cryptic terms recorded in telephone conversations between appellants. Howard testified that many of the terms used by appellants, including "the boyfriend," "the boy," "transcripts," "briefs," and "motions," meant heroin; that "lawyer" and "attorney" meant sources of heroin; and that "the girl" and "them broads" meant cocaine. Howard also opined about the meaning of appellants' coded references to prices, amounts, quality, and payment procedures for heroin. Appellants objected to the district court's qualification of Howard as an expert, but thereafter, except for two instances that are not challenged on appeal, did not object to Howard's interpretations of the coded conversations. Appellants now charge that the district court erred in qualifying Howard as an expert in "trafficking in heroin," that Howard was impermissibly allowed to opine about appellants' mental states in violation of Fed.R.Evid. 704(b), that Howard drew impermissible legal conclusions, and that Howard's expert testimony should have been excluded as unduly prejudicial under Fed.R.Evid. 403. Each contention is unpersuasive.
 
 
 29
 Appellants first ask us to circumscribe a district court's authority to qualify an expert in a particular field of the narcotics trade. Under the circumstances, we decline this invitation. A number of our cases have held that a district court is vested with broad discretion in deciding whether to admit expert testimony under Fed.R.Evid. 702, and that its decision will not be reversed unless "manifestly erroneous." United States v. Nersesian, 824 F.2d 1294, 1308 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); United States v. Cruz, 797 F.2d 90, 96 (2d Cir.1986). But see United States v. Young, 745 F.2d 733, 765 (2d Cir.1984) (Newman, J., concurring) (expert's testimony that observed events constituted a narcotics sale was of doubtful value), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Moreover, we have repeatedly stated that operations of narcotics dealers are a proper subject for expert testimony. See United States v. Carmona, 858 F.2d 66, 69 (2d Cir.1988); Nersesian, 824 F.2d at 1308; Cruz, 797 F.2d at 96; United States v. Khan, 787 F.2d 28, 34 (2d Cir.1986). This conclusion derives from Fed.R.Evid. 702 itself, which provides:
 
 
 30
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 31
 Expert testimony in the field of narcotics operations is often helpful to jurors "who [are] likely unfamiliar with words and phrases used by narcotics dealers to camouflage their activities." United States v. Kusek, 844 F.2d 942, 949 (2d Cir.), cert. denied, 488 U.S. 860, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988).
 
 
 32
 The district court's decision to permit DEA Agent Howard to be qualified as an expert in heroin trafficking certainly was not manifestly erroneous. Howard had been employed by the DEA for sixteen years, had extensive experience in narcotics investigations, and had testified similarly on several previous occasions. As a result, he was well-suited to explain the meaning of appellants' coded references to heroin. In addition, as the record reflects and appellants do not challenge, Howard was able to explain the cryptic meaning of the intercepted messages, and therefore assisted the jury's understanding of the evidence. Consequently, instead of being improper, the district court's decision to permit qualification of Howard comported fully with the purposes underlying Fed.R.Evid. 702.[5]
 
 
 33
 The claim that Howard impermissibly testified about appellants' mental states in violation of Fed.R.Evid. 704(b) is similarly without merit. Appellants cite two instances in which Howard supposedly overstepped the line of permissible expert testimony: the interpretation that "he will wear green" meant that Peter Monsanto would have money with him, and the interpretation that "he knows how to go" meant that Peter Monsanto should pay for heroin on receipt rather than in advance. Initially, we note that appellants' failure to object to this testimony at trial precludes raising the issue on appeal. See Fed.R.Evid. 103(a)(1); United States v. Carson, 702 F.2d 351, 369 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); United States v. Hutcher, 622 F.2d 1083, 1087 (2d Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). But, in any event, even reading the challenged statements in the light most favorable to appellants, we find no basis for concluding that Howard "state[d] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed.R.Evid. 704(b). Rather, Howard's testimony, which related only to the meaning of unfamiliar narcotics jargon, left to the jury the task of determining whether the decoded terms demonstrated the necessary criminal intent.
 
 
 34
 Appellants' third argument, which closely tracks the second claim, is that the two disputed interpretations constituted impermissible legal conclusions. As we have recently indicated, "[s]uch testimony is subject to challenge only when the expert interprets and draws conclusions from the evidence instead of simply testifying as to the jargon of the drug trade." United States v. Garcia, 848 F.2d 1324, 1335 (2d Cir.1988), rev'd on other grounds, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). We find no basis for concluding that the challenged statements constituted legal conclusions. Howard's testimony was self-defining, in that his opinions contained only factual assertions that were not subject to diverse judicial interpretations. Cf. United States v. Scop, 846 F.2d 135, 140-41 (2d Cir.1988) (impermissible for expert testimony to include statutory or regulatory language such as "manipulation" and "fraud" that is subject to diverse judicial or jury interpretations). In addition, Howard's testimony was far less conclusory than testimony concerning ultimate facts, which has been routinely allowed in narcotics cases. See, e.g., United States v. Brown, 776 F.2d 397, 400 (2d Cir.1985) (permissible for expert to testify that appellant acted as "steerer" in a narcotics sale), cert. denied, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); United States v. Young, 745 F.2d 733, 760-61 (2d Cir.1984) (permissible for expert to testify that, based on his observations, narcotics transaction had taken place), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); Carson, 702 F.2d at 369-70 (same). In this case, we need not address whether there has been too ready an acceptance of expert testimony on ultimate facts in narcotics cases.
 
 
 35
 Appellants' last challenge is that Howard's testimony should have been excluded under Fed.R.Evid. 403 because its slight probative value was substantially outweighed by the danger of unfair prejudice. Specifically, appellants claim that Howard's personal knowledge of the case created a special aura of reliability that unfairly influenced the jury's decision to credit his testimony. See Young, 745 F.2d at 765-66 (Newman, J., concurring). While that danger may be present when an expert is asked to provide an opinion about the general criminal nature of a defendant's conduct, there is no similar basis for concern when the expert's testimony is limited, as it was here, to interpretations of coded messages. Appellants cite no reason, nor can we find any, to believe that Howard's testimony on this rather technical subject was made more credible by any personal knowledge that he may have had of appellants' criminal activities.
 
 D. Relevancy Determinations
 1. Richard Romero's 1985 Heroin Sale
 
 36
 In December 1985, Steven Monsanto and Miriam Baker agreed to sell heroin to Kim Smith. Because Peter Monsanto could not supply the drugs at that time, Baker visited Steven Monsanto in prison, where she was introduced to Richard Romero, who was there visiting another inmate. Thereafter, Peter Monsanto met with Romero on December 16, 1988 in the Queens Motor Lodge. The nature of this meeting is the subject of this evidentiary challenge. The Government alleged at trial that, at the meeting, Peter Monsanto sought to obtain a source of heroin for the sale to Kim Smith. To prove its contention, the Government introduced evidence that Romero, in September 1985, had sold 450 grams of heroin to undercover DEA Agent Charles Howard in Brooklyn. According to the Government, this September sale increased the probability that the purpose of the Monsanto-Romero December 16 meeting was to obtain the heroin that appellants lacked. The district court admitted the evidence over appellants' objections.
 
 
 37
 Determinations of relevancy are, of course, generally entrusted to the sound discretion of the district court, and will be disturbed on appeal only when they are arbitrary or irrational. See United States v. Torres, 901 F.2d 205, 235 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); United States v. Diaz, 878 F.2d 608, 614 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986); United States v. Esdaille, 769 F.2d 104, 108 (2d Cir.), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). Similarly, because the district court is in a better position to evaluate the danger of unfair prejudice resulting from particular evidence, a ruling under Fed.R.Evid. 403 will be reversed only upon a clear showing that a district court abused its discretion. See United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982); United States v. Albergo, 539 F.2d 860, 863 (2d Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976).
 
 
 38
 Here, there is no indication that the district court abused its discretion in admitting evidence of Richard Romero's September 1985 heroin sale to Agent Howard. Evidence that does not directly establish an element of an offense may be relevant to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). Romero's September 1985 heroin sale constituted such background evidence. In addition, evidence that Romero had sold heroin three months before his meeting with Peter Monsanto was relevant because it made it "more probable ... than it would be without the evidence" that the Romero-Monsanto December meeting concerned an additional sale of heroin. Fed.R.Evid. 401. Finally, because the September sale concerned the criminal act of a third party and not that of any appellant, the potential for unfair prejudice was minimal.
 
 
 39
 2. Attorney Leon Port's Legal Representation
 
 
 40
 To prove who belonged to the Monsanto Crew, the Government introduced evidence that many of the alleged co-conspirators had been represented by attorney Leon Port. Specifically, witnesses testified that Port was Peter Monsanto's attorney, that he had helped Gary Simmons create a front business for the Crew, that he had represented Arnold Lawson in a 1984 state narcotics trial, that he had represented Pat Doll in a 1984 New Jersey prosecution, and that he had represented Robert Cofer in a 1982 weapons conviction. The evidence also indicated that Peter Monsanto preferred that members of his organization use Port as their attorney. Indeed, witnesses testified that Peter Monsanto financed Port's representation of Crew members on more than one occasion. Appellants now claim that the evidence of Port's multiple representation lacked any probative force, and therefore should have been excluded under Fed.R.Evid. 401. Appellants also claim that the Government impermissibly stated during its summation that Port acted as "house counsel" for the Monsanto Crew.
 
 
 41
 We have previously indicated that payment of attorneys' fees by one individual on behalf of other suspected members of a criminal enterprise "may imply facts about a prior or present relationship" between the benefactor and his beneficiaries. See In re Shargel, 742 F.2d 61, 64 (2d Cir.1984). Certainly, evidence of such payments is highly relevant to whether the benefactor is the head of a criminal enterprise as defined by the RICO statute. See In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238, 251 (2d Cir.1985) (en banc), cert. denied, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). On the other hand, evidence that a single attorney represented members of an alleged conspiracy, on its own, has no probative force. As we stated in Shargel, "the fact that a lawyer has multiple clients in no way implies a connection between them." 742 F.2d at 63 n. 3. This observation, however, was made under circumstances in which there was no other evidence of a criminal association between the attorney's clients. We specifically noted that, had appellants consulted with an attorney as a group rather than as individuals, the evidence would have been probative of concerted activity among the several clients. See id. at 64.
 
 
 42
 Applying these principles, we find that the district court properly admitted evidence of Port's representation of multiple members of the Monsanto Crew. Here, the testimony was not simply that Port represented alleged co-conspirators on different occasions. Rather, the evidence demonstrated that Peter Monsanto preferred that appellants use Port and that, in at least some situations, he made benefactor payments to Port on their behalf, including a payment with Gary Simmons of $10,000 to handle an appeal for Arnold Lawson in a state narcotics case and of $100,000 to $150,000 for services in connection with certain FBI searches. These facts alone created a suspicion that appellants were somehow linked. Under these circumstances, evidence that appellants did in fact use Port as their attorney was relevant to prove that appellants were associated. See, e.g., United States v. Castellano, 610 F.Supp. 1151, 1160 (S.D.N.Y.1985) ("[W]hen other suspicious circumstances are present, the decision of a number of persons to retain the same lawyer may be probative of an association among them."). Moreover, the Government's statement in argument that Port acted as "house counsel" was permissible given Port's extensive legal representation of the members of Monsanto Crew. See Nersesian, 824 F.2d at 1327 (prosecutor has broad latitude during closing arguments to suggest inferences to the jury); United States v. Suarez, 588 F.2d 352, 354 (2d Cir.1978) (same).
 
 
 43
 E. Roberta Sanders's Out-of-Court Identification
 
 
 44
 Roberta Sanders, who worked as a street level heroin dealer from the fall of 1981 until 1986, testified that she encountered Gary Simmons on numerous occasions. Three separate times, Gary Simmons allegedly delivered quantities of loose, bulk heroin to Sanders who, in turn, delivered the supply to her employer. On a fourth occasion, after Sanders had been knocked unconscious and the heroin was stolen, she was abducted at gunpoint and brought to meet Gary Simmons, who questioned her about the missing heroin. Accusing Sanders of staging the robbery, Simmons allegedly smashed Sanders' hand with a baseball bat, breaking a finger, and threatened her life.
 
 
 45
 Despite her frequent contacts with Gary Simmons, Sanders did not identify him during trial. As a substitute, the Government sought to introduce evidence that Sanders had unequivocally identified Gary Simmons from an array of thirteen photographs on May 2, 1988. During a hearing on the matter, the Government indicated that Sanders had previously identified Gary Simmons in November 1987, but that no record of that procedure had been kept. In addition, a detective testified that, on May 2, before identifying Simmons from the thirteen photograph array, Sanders had been unable to identify Simmons from another array of six photographs. After considering the matter, the district court decided to admit Sanders's May 2 positive identification from the thirteen photograph array under Fed.R.Evid. 801(d)(1)(C). Gary Simmons appeals that decision on the ground that the out-of-court identification procedures were unduly suggestive.
 
 
 46
 A prior identification is generally admissible under Fed.R.Evid. 801(d)(1)(C) regardless of whether there has been an accurate in-court identification. See United States v. Owens, 484 U.S. 554, 562-63, 108 S.Ct. 838, 844-45, 98 L.Ed.2d 951 (1988); United States v. Lewis, 565 F.2d 1248, 1252 (2d Cir.1977), cert. denied, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978). Such an identification will be excluded on constitutional grounds only when it is " 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.' " United States v. DiTommaso, 817 F.2d 201, 213 (2d Cir.1987) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). Moreover, even a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability. See id. at 213; United States v. Bubar, 567 F.2d 192, 197 (2d Cir.), cert. denied, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). Finally, a district court's admission of evidence under Fed.R.Evid. 801(d)(1)(C) will be reversed only upon a showing of clear error. See DiTommaso, 817 F.2d at 213; United States v. Damsky, 740 F.2d 134, 140 (2d Cir.), cert. denied, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984).
 
 
 47
 Gary Simmons does not argue that Sanders's May 2 identification was, by itself, impermissibly suggestive. Rather, he contends that the Government's failure to record the events surrounding the November 1987 identification procedure infected the entire process of identification, thereby creating a basis upon which to exclude the subsequent May 2 identification. We do not agree. Other than the negative inference appellant would have us draw from the November 1987 procedure, there is nothing to indicate that Sanders's May 2 identification was unduly suggestive. Without any evidence to suggest otherwise, we refuse to speculate that the November 1987 procedure made the May 2 procedure "conducive to an irreparable mistaken identification." Stovall, 388 U.S. at 302, 87 S.Ct. at 1972.
 
 II. District Court's Charge
 
 48
 Appellants raise three challenges to the district court's charge to the jury. First, the claim is that the acts of racketeering activity charging murders and murder conspiracies did not satisfy RICO's pattern requirement and therefore were improperly charged as racketeering acts in Counts One and Two. Second, Peter Monsanto claims that the district court erred in allowing the jury to consider narcotics offenses other than those charged in the indictment as proof that he had engaged in a continuing criminal enterprise. Third, Arnold Lawson claims that the district court erroneously instructed the jury regarding a 1982 heroin sale that the Government alleged as Racketeering Act # 13. We hold that all three challenges are unavailing.
 
 A. Pattern of Racketeering Activity
 
 49
 Appellants argue that the murders of Bobby Walker, William Graham and Billy Shuff, as well as the conspiracy to murder Jacqueline Monsanto's attackers, should not have been charged as racketeering acts for the purposes of proving the elements of 18 U.S.C. Secs. 1962(c) & (d). These challenges seem to divide into two separate arguments: (1) that the challenged predicates did not constitute a "pattern of racketeering activity" under the RICO statute; and (2) that the challenged predicates were not sufficiently related to the affairs of the criminal enterprise. Both arguments raise issues that have been litigated extensively and that have been resolved through detailed analysis of the history and purpose of the RICO statute. This lineage aptly demonstrates that appellants' claim is without merit.
 
 
 50
 The RICO statute itself does not define the exact contours of a "pattern of racketeering activity." Nonetheless, the Supreme Court has recently distilled two principles from the statute's pattern requirement. First, there must be a demonstrable relationship between or among the acts of racketeering activity. See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.1989) (en banc). Such a relationship may be established in many ways, including by proof that the predicate acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " Northwestern Bell, 109 S.Ct. at 2901 (quoting 18 U.S.C. Sec. 3575(e) (1988)). Second, "the predicates themselves [must] amount to, or otherwise constitute a threat of, continuing racketeering activity." Id. at 2901 (emphasis in original); Indelicato, 865 F.2d at 1381. This prong of the pattern requirement "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Northwestern Bell, 109 S.Ct. at 2902.
 
 
 51
 These principles support the district court's instructions. First, many of the same appellants were charged with the murders of Walker, Graham and Shuff, as well as several of the other racketeering acts alleged in the indictment. As previously indicated, the involvement of similar participants is sufficient to demonstrate a relationship among the predicate acts. See id. at 2901. Second, the evidence at trial indicated that the murders of Walker, Graham and Shuff were intended, in part, to maintain discipline within the Monsanto Crew and to help protect its narcotics operations from external challenges. As a result, by their very nature these acts threatened repetition and thereby satisfied the continuity prong of the pattern requirement.
 
 
 52
 Appellants' next claim is that there was an insufficient nexus between the pattern of racketeering activity and the criminal enterprise. Although to prove a RICO violation the Government must establish a relationship between the predicate acts and the criminal enterprise, the statute leaves undefined the precise nature of that relationship. See United States v. LeRoy, 687 F.2d 610, 617 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Nonetheless, we have consistently held that:
 
 
 53
 [t]he requirement of connection to a RICO enterprise is satisfied if the evidence is sufficient to establish either that the defendant 'is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise,' or that 'the predicate offenses are related to the activities of the enterprise.'
 
 
 54
 United States v. Salerno, 868 F.2d 524, 533 (2d Cir.1989) (quoting United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980) (emphasis in original), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)), cert. denied, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); United States v. Robilotto, 828 F.2d 940, 947-48 (2d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); LeRoy, 687 F.2d at 617.[6] In addition, the predicate acts need not be in furtherance of the affairs of the criminal enterprise. See LeRoy, 687 F.2d at 617; Scotto, 641 F.2d at 54.
 
 
 55
 Under these standards, the murders of Walker, Graham and Shuff, and the conspiracy to murder Jacqueline Monsanto's attackers, were sufficiently related to the Monsanto Crew's criminal enterprise to establish a RICO violation. First, testimony indicated that Peter Monsanto refused to supply heroin to the members of the Crew until his wife's attackers had been caught and punished. Thus, the jury could well have inferred that Peter Monsanto was able to secure personal benefits--the murders of his wife's attackers--as a result of his position as the leader of the enterprise. See, e.g., Robilotto, 828 F.2d at 947-48 (personal loans received by a union official because of his status were sufficiently related to the enterprise); LeRoy, 687 F.2d at 617 (illegal kickbacks received by union official because of his status were sufficiently related to the enterprise). Second, there was sufficient evidence for the jury to conclude that the challenged predicates were "related" to the affairs of the enterprise. For example, Walker's murder stemmed from his narcotics debts to Peter Monsanto and thus may have induced other Crew members to conform to the operation's standards. Similarly, the Graham and Shuff murders indicated that the Crew would swiftly retaliate against aggression, and therefore helped maintain the Crew's respect on the street. All three murders, therefore, were related to the Monsanto enterprise, and were properly charged as racketeering acts to prove the elements of Counts One and Two.
 
 B. Continuing Criminal Enterprise
 
 56
 Peter Monsanto alleges that his conviction under 21 U.S.C. Sec. 848 must be reversed because the indictment failed to allege an adequate number of predicate acts to constitute a violation of the statute. To prove a violation of 21 U.S.C. Sec. 848, the Government must prove, among other things, that the defendant committed one felony violation, which was part of a series of at least three violations of the federal narcotics laws. See United States v. Young, 745 F.2d 733, 747 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). However, contrary to Monsanto's claim, the indictment need not specify each violation that constitutes the series. See United States v. Aiello, 864 F.2d 257, 265 (2d Cir.1988); Young, 745 F.2d at 747. Indeed, the Government need not plead or obtain convictions on any of the eligible predicate offenses, but may instead "simply ... prove at trial a continuing series of at least three felony offenses." Aiello, 864 F.2d at 265. Under these standards, Monsanto's challenge to the number of predicate acts enumerated in the indictment must fail.
 
 
 57
 Peter Monsanto also claims that the district court erroneously charged that proof of a conspiracy to distribute narcotics could itself be a basis for a conviction under 21 U.S.C. Sec. 848. This claim mischaracterizes the district court's charge. As the record reflects, the district court properly instructed that proof of participation in a conspiracy to distribute narcotics could establish the first element of a section 848 violation--that Monsanto committed one or more violations of the federal narcotics laws.[7] Contrary to Monsanto's assertion, the district court never indicated that evidence of a conspiracy alone could establish all the remaining elements necessary to prove a violation under the statute.
 
 C. Racketeering Act # 13
 
 58
 Arnold Lawson poses two challenges to the district court's charge on Racketeering Act # 13, which alleged that Lawson sold heroin to an undercover DEA agent on September 16, 1982.[8] First, Lawson claims that the court misled the jury into believing that Racketeering Act # 13 need not be proved beyond a reasonable doubt. This challenge stems from the fact that the district court's instruction on Racketeering Act # 13, unlike those on the other racketeering acts, did not specify the elements the jury must find beyond a reasonable doubt. Instead, the district court charged that the Government need only prove beyond a reasonable doubt that the predicate act was committed in the course of the affairs of a criminal enterprise. Second, Lawson claims that the district court erroneously instructed the jury that evidence of a state narcotics conviction "supported the Government's contention" that Lawson, in fact, participated in the alleged 1982 heroin sale.
 
 
 59
 We need not address the merits of Lawson's particular challenges because the resulting error, if any, was harmless. The evidence at trial established that Arnold Lawson participated in at least five acts of racketeering activity other than those alleged in Racketeering Act # 13: the murder of Bobby Walker (Racketeering Act # 1), the conspiracy to murder Jacqueline Monsanto's attackers (Racketeering Act # 2), the murders of William Graham and Billy Shuff (Racketeering Acts # 3-4), and the conspiracy to distribute narcotics (Racketeering Act # 5). Even assuming that the district court erroneously charged the jury on Racketeering Act # 13, the four other predicates are more than sufficient to support the jury's findings that Lawson was guilty of participating in and conspiring to participate in a criminal enterprise through a pattern of racketeering activity.[9]
 
 III. Sufficiency of the Evidence
 
 60
 Peter Monsanto, Arnold Lawson, and Robert Cofer contend that the evidence was insufficient for the jury to have found them guilty of the murder of Bobby Walker. In making this argument, these appellants maintain that no reasonable factfinder would have believed Steven McGauley, who testified that appellants had admitted to the Walker murder. In addition, appellants claim that their convictions for Walker's murder were impermissibly based on the uncorroborated admissions about which McGauley testified. Both claims are unconvincing.
 
 
 61
 A jury's verdict will be upheld when "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." United States v. Fiore, 821 F.2d 127, 128 (2d Cir.1987). This exacting standard of review requires us to construe the evidence in the light most favorable to the Government, see United States v. Gurary, 860 F.2d 521, 523-24 (2d Cir.1988), cert. denied, 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989); United States v. Martino, 759 F.2d 998, 1002 (2d Cir.1985), and to draw all inferences in favor of the verdict. See United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); United States v. Teitler, 802 F.2d 606, 614 (2d Cir.1986).
 
 
 62
 Under this narrow standard of review, we find no reason to disturb the jury's finding that appellants participated in the murder and conspiracy to murder Bobby Walker. Appellants' objections to McGauley's testimony center around his allegedly inconsistent prior statements, physical evidence that purportedly contradicted his story, and his possible incentive to fabricate testimony to curry favor with the Government. These objections, however, relate only to McGauley's credibility. Because, on appeal, we must construe the evidence in the light most favorable to the Government, we reject this challenge to McGauley's testimony.
 
 
 63
 Appellants, citing Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), also argue that their convictions cannot be based solely on McGauley's testimony concerning their admissions to the Walker murder. In Opper and Smith, the general rule that a conviction may not be based solely on a defendant's own uncorroborated confession was extended to situations where a defendant admits inculpatory facts to law enforcement agents. See Opper, 348 U.S. at 90-91, 75 S.Ct. at 162-63; Smith, 348 U.S. at 155, 75 S.Ct. at 198. These holdings are inapposite to the present case. In Opper and Smith, the Court was concerned with statements made to law enforcement officers after the commission of the crime, and not with statements made between co-conspirators in furtherance of a conspiracy. This is a critical distinction. When a law enforcement officer obtains an uncorroborated admission, its reliability may be questioned because of the "pressure of a police investigation." Smith, 348 U.S. at 153, 75 S.Ct. at 197. There is not the same risk when statements are made between co-conspirators in furtherance of a conspiracy. See Bourjaily v. United States, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987) (holding that independent indicia of reliability are not required to admit co-conspirator statements under Fed.R.Evid. 801(d)(2)(E)); United States v. Lieberman, 637 F.2d 95, 103 (2d Cir.1980) (suggesting that the reliability of co-conspirator statements is fortified when made in furtherance of a conspiracy); United States v. Paoli, 603 F.2d 1029, 1036 (2d Cir.) (same), cert. denied, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979). Because we find that appellants' admissions were made to further the ends of the Monsanto Crew's criminal enterprise, it is irrelevant whether their admissions were corroborated by additional evidence.
 
 IV. Remaining Claims
 A. Government's Summations
 
 64
 During summation, the Government argued that the evidence proved that Steven Monsanto was involved in distributing heroin for the Monsanto Crew. To substantiate this claim, the Government reminded the jury of a letter in which Kim Smith referred to cocaine as "girl." The Government argued that the letter proved that when Steven Monsanto used the term "boy," he meant heroin rather than, as he testified, rock cocaine.[10] In addition, the Government played a tape recording in which Steven Monsanto apparently acknowledged his connection to heroin distribution. Steven Monsanto now claims that the Government improperly referred to this evidence during its summation, and therefore deprived him of a fair trial. This claim is baseless. As we have already indicated, the Government is accorded wide latitude in the "inferences [it] may reasonably suggest to the jury during closing argument." Nersesian, 824 F.2d at 1327. We see no reason to hold that the inference the Government urged the jury to draw from properly admitted evidence was not within the bounds of proper argument.
 
 
 65
 Peter Monsanto joins his brother in challenging the Government's summation. Initially, he claims that the Government improperly chastised the defense for its conduct during summations. For example, he claims that the Government unjustifiably asserted that the defense had not focused on the facts, had intentionally attempted to confuse the issues, and had stated personal opinions during its own summations. These claims must be viewed in the context of the banter between the parties. During summations, defense counsel had, in fact, interjected their own personal beliefs about the evidence.[11] In addition, the defense had alleged that the Government had improperly coaxed witnesses into favorable responses and had concealed exculpatory information. Under the circumstances, we will not reprimand the Government's tactics. As we have stated, "when the defense counsel have attacked the prosecutor's credibility ... the prosecutor is entitled to reply with 'rebutting language suitable to the occasion.' " United States v. Praetorius, 622 F.2d 1054, 1060-61 (2d Cir.1979) (quoting United States v. LaSorsa, 480 F.2d 522, 526 (2d Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)), cert. denied, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).
 
 
 66
 Peter Monsanto makes two additional charges with respect to the Government's summation. First, he claims that the Government improperly referred to a witness's participation in the Witness Protection Program. This claim is easily dismissed. In summations, the defense suggested that Steven McGauley had fabricated testimony in exchange for various benefits from the Government, including placement in the Witness Protection Program. In response, the Government stated that the only "benefit" McGauley received from entering the program was protection "so that he wouldn't wind up on the pavement somewhere like Mr. Shuff." Because this statement responded to the defense's attack against McGauley's credibility, it was not improper argument. Second, Peter Monsanto claims that the Government improperly referred to the "collapsed veins of junkies" and "swollen arms" in its closing arguments. Certainly, these comments were blunt and to the point. However, that alone is not a basis to find them improper. See United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir.1974). In addition, viewed in the context of the whole trial, these comments alone do not justify a new trial. See United States v. Biasucci, 786 F.2d 504, 514 (2d Cir.) (inappropriate Government comments, standing alone in an otherwise fair proceeding, are normally not a basis to overturn a conviction), cert. denied, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986).
 
 B. Pre-Indictment Delay
 
 67
 Peter Monsanto, Robert Cofer, Gary Simmons, Alex Simmons, Miriam Baker and Sedgwick Harvey argue that they suffered undue delay in being prosecuted for their federal crimes. This claim rests on the fact that appellants were indicted by state authorities in June 1986 for the murders of Bobby Walker, William Graham and Billy Shuff, but were not prosecuted for those crimes under the federal indictment until January 1988. This delay of over a year, appellants argue, violated their rights to a speedy trial under the Speedy Trial Act, 18 U.S.C. Secs. 3161-3174 (1988), the Fifth Amendment's due process clause, and the Sixth Amendment's speedy trial clause. All three claims are without merit.
 
 
 68
 First, it is well-settled that the statutory time limits imposed by the Speedy Trial Act begin to run after the federal arrest, and not after the preceding state arrest and indictment. See United States v. Gomez, 776 F.2d 542, 549-550 (5th Cir.1985); United States v. Lai Ming Tanu, 589 F.2d 82, 88 (2d Cir.1978); United States v. Mejias, 552 F.2d 435, 441 (2d Cir.), cert. denied, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). As a result, appellants cannot claim that their June 1986 state indictments affected their rights to a speedy trial, which only began to accrue after their federal arrest in the current case.
 
 
 69
 Second, appellants make no claim that the pre-indictment delay, were there any, caused them any prejudice. As a result, their Fifth Amendment claim must fail. See United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971) (due process violation requires actual prejudice); United States v. Lawson, 683 F.2d 688, 694 (2d Cir.1982) (same); United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir.) (same), cert. denied, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). Because proof of actual prejudice is a substantial factor in proving a violation under the Sixth Amendment, that claim also fails. See Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972); see also Montalvo v. United States, 862 F.2d 425, 426 (2d Cir.1988).
 
 C. Assistance of Counsel
 
 70
 Peter Monsanto argues that his trial attorney was unfamiliar with the facts of the case, that he was inexperienced in trying complex criminal conspiracy cases, that he ineffectively cross-examined witnesses, and that he had no discernable trial strategy. As a result, he claims that his attorney was so ineffective that his Sixth Amendment right to counsel was violated. Our review of this matter is, of course, dictated by the stringent test articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, a defendant must not only demonstrate that his attorney's performance was below an objectively reasonable standard, but also must prove that, but for the deficiency, the result of the proceeding would have been different. See id. at 687, 104 S.Ct. at 2064; see also Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986). Peter Monsanto's claim surmounts neither of these hurdles. First, there is no evidence that his trial attorney performed unreasonably. The record indicates that the attorney repeatedly attacked the credibility of key Government witnesses, as well as provided alternative and plausible explanations for damaging evidence presented by the Government. While Peter Monsanto may not be pleased with the strategy employed by his trial attorney, that alone is insufficient to establish his attorney's ineffectiveness. Second, assuming that his attorney's performance was objectively unreasonable, Peter Monsanto has not demonstrated the necessary prejudice to warrant reversal of his conviction. Rather, Peter Monsanto merely presupposes that a more competent attorney would have obtained an acquittal. No support is provided for this conclusion. In fact, given the plethora of evidence against him, there is little reason to believe that alternative counsel would have fared any better.
 
 D. Effect of the En Banc Decision
 
 71
 Peter Monsanto argues that our ruling in United States v. Monsanto, 852 F.2d 1400 (2d Cir.1988) (en banc ) ("Monsanto II "), should have been deemed the "law of the case," and therefore applied by the district court in the instant action. In Monsanto II, we held that the post-indictment restraint of Peter Monsanto's assets was unwarranted, and that the assets should have been made available for the payment of attorney's fees. The question is whether the district court, in accordance with Monsanto II, should have severed Peter Monsanto's case from that of his co-defendants and ordered a new trial.
 
 
 72
 The claim is without merit. A Court of Appeals decision does not become effective until its mandate issues. See Bryant v. Ford Motor Co., 886 F.2d 1526, 1529 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1126, 107 L.Ed.2d 1033 (1990); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir.1988); Ostrer v. United States, 584 F.2d 594, 598 (2d Cir.1978). In Monsanto II, our mandate was stayed while our decision was reviewed, and ultimately reversed, by the Supreme Court. See United States v. Monsanto, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989). As such, our decision was never binding on the proceedings below. Accordingly, it was correct for the district court to proceed as it did and deny Peter Monsanto's motion for severance and a new trial based on the Monsanto II ruling. Similarly, because Monsanto II never became the "law of the case," it is not now a valid basis for Peter Monsanto to challenge his conviction.
 
 
 73
 Appellants' remaining claims do not raise substantial issues, and therefore do not warrant further discussion.
 
 
 74
 Accordingly, appellants' convictions are affirmed.
 
 
 
 *
 The Honorable Jane A. Restani, United States Court of International Trade, sitting by designation
 
 
 [1]
 Seven defendants other than appellants were also charged in the indictment, but are not the subject of this appeal. These include Pat Doll, Jacqueline Brown and Kim Smith, who were tried and convicted along with appellants, but have not appealed their convictions; Michael Smithzer and Sam Cooper, who were acquitted of all charges after trial; and Eddie Simmons and Edward Robinson, who were fugitives at the time of trial
 
 
 [2]
 The Government argues that it is ambiguous whether the district court's May 26 admissibility ruling excluded those portions of McGauley's state grand jury testimony concerning the Graham-Shuff murders. We disagree. On May 26, the district court received the disputed exhibit into evidence, but cautioned that it should not be published to the jury "until it had been redacted to equate to the examination conducted by counsel." (Tr. 11691). At the end of trial, the court shed light on the meaning of this ruling:
 The thrust of what I appear to have said and what I have just read appears to focus on McGauley's grand jury testimony concerning the Bobby Walker homicide. Certainly, anything that he said there on that subject would seem to me to be appropriate. The question really is, did I or did something that happened after that open the door to more of this transcript being admitted than I intended on May 26 (Tr. 15726) (emphasis added).
 This critical passage indicates that on May 26 the district court intended to admit only those portions of McGauley's state grand jury testimony that referred to the Walker murder, and not those portions that concerned the Graham-Shuff murders.
 
 
 [3]
 It is questionable whether McGauley's state grand jury testimony regarding the murders of Graham and Shuff should have been admitted under Fed.R.Evid. 801(d)(1)(B). As we have previously stated, the law concerning the admissibility of prior consistent statements "is not exactly a seamless web." United States v. Pierre, 781 F.2d 329, 330 (2d Cir.1986). Generally, evidence may be admitted under the rule to rebut charges of recent fabrication only when the statement in question was made before the declarant had a motive to fabricate. See United States v. Brennan, 798 F.2d 581, 587 (2d Cir.1986); United States v. Quinto, 582 F.2d 224, 232 (2d Cir.1978). However, prior consistent statements that are made after the motive to fabricate arises also may be admitted if the witness's credibility has been specifically attacked. See Brennan, 798 F.2d at 587-88; United States v. Pierre, 781 F.2d 329, 333-34 (2d Cir.1986)
 Here, the record does not reflect the basis upon which the district court decided to admit the disputed testimony. Nevertheless, our finding that any error in admitting the disputed testimony was harmless renders the issue moot.
 
 
 [4]
 More recently, we have treated the issue of extra-record infiltration only from the perspective of the resulting prejudice to the defendant, without discussing the source of the error. See, e.g., United States v. Weiss, 752 F.2d 777, 782-83 (2d Cir.), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983). While an inquiry into prejudice is always necessary, we take this opportunity to emphasize that the error in admitting extra-record evidence is constitutional in nature
 
 
 [5]
 Appellants' reliance on United States v. Nersesian, 824 F.2d 1294 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987), is ill-founded. In Nersesian, we expressed discomfort with uncontrolled expert testimony, where a witness not only testifies to the meaning of narcotics code words, but also marshals the evidence and states that, on the whole, the evidence refers to one type of narcotic rather than another. See id. at 1308. That concern need not trouble us here, where Howard responded to questions regarding the meaning of specific terms, and never made sweeping conclusions about appellants' activities
 
 
 [6]
 Appellants' suggestion that this formulation excludes enterprises that are associations-in-fact is completely without support. As the Supreme Court has stated in interpreting the term "enterprise" in the RICO statute, "[t]here is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)
 
 
 [7]
 The district court charged the jury as follows:
 The first element of the offense charged in Count Four is that you must find that Peter Monsanto committed one or more violations of the narcotics laws. It is not necessary that the one or more violations with which you are concerned for purposes of Count Four be specifically charged elsewhere in the indictment. Therefore, this element is satisfied if you find beyond a reasonable doubt that Peter Monsanto is guilty either of the crime of conspiracy charged in Count Three, the elements of which I have already discussed, or that he is guilty of any other narcotics law violation not specifically charged in the indictment, such as, for example, distributions of heroin or possession of heroin with intent to distribute.
 (TR. 15555) (emphasis added).
 
 
 [8]
 The Government also listed the 1982 heroin sale as one of the thirty-two overt acts that supported Count Three (narcotics conspiracy). Because the Government need not plead or prove any overt act to prove a conspiracy to distribute controlled substances, see United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir.1980) (listing cases), a discussion of Lawson's claims in relation to Count Three is unnecessary
 
 
 [9]
 Because other predicate acts support the RICO and RICO conspiracy counts, we need not discuss whether Racketeering Act # 13 is affected by the fact that Lawson's state conviction for the 1982 heroin sale was recently vacated, see People v. Arnold Lawson, No. 1466-83, slip. op. at 9 (N.Y.Sup.Ct. Oct. 25, 1990), or by the slim possibility that William Arrington, one of Lawson's defense witnesses, improperly invoked his privilege against self-incrimination
 
 
 [10]
 The meaning that Kim Smith ascribed to the word "girl" was relevant to Steven Monsanto's culpability, given the fact that Kim Smith had negotiated to purchase narcotics from Steven Monsanto while he was in jail in December 1985. See supra
 
 
 [11]
 For example, defense counsel made the following statements during closing arguments: "I believe that's the impression that was given to you." (Tr. 14700); "I knew that [the Government] knows" that a Government witness supposedly failed to incriminate a defendant (Tr. 14720); "I think [the Government] knows that [a Government witness] knows that [a defendant] had nothing to do with any drug operation in the Bronx." (Tr. 14758-59)