**REVISED October 20, 2015**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-31287

United States Court of Appeals
Fifth Circuit

**FILED**

October 15, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

CLARENCE HAINES, also known as Knowledge Haines; RAYMOND
PORTER, also known as T. Porter; JOSE ITURRES–BONILLA,

Defendants–Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, SMITH, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD:

Defendants-Appellants Clarence Haines, Raymond Porter, and Jose
Iturres-Bonilla were charged with one count of conspiracy to possess with
intent to distribute one kilogram or more of heroin and one count each of using
a communication facility in facilitating the commission of that crime. Both
counts stemmed from Defendant-Appellants' involvement in a heroin ring. At
trial, the DEA case agent testified both as a fact witness about their case and
as an expert witness about drug code. All three defendants were convicted on
both counts.

No. 13-31287

The jury found that the total scope of the conspiracy involved one kilogram or more of heroin, and the district court concluded that this finding triggered the statutory minimum of 20 years' imprisonment for Haines and Porter, and also increased Iturres-Bonilla's statutory maximum from 20 years' imprisonment to life imprisonment. All three defendants challenge the sufficiency of the evidence for their convictions and the district court's use of a conspiracy-wide drug-quantity jury finding instead of an individual-specific drug-quantity jury finding. All three defendants also argue that the DEA agent's testimony was improper. Iturres-Bonilla makes several other challenges to his sentence.

Because there is no merit to defendants' sufficiency of the evidence arguments, and because the portions of the DEA agent's testimony that were admitted in error were harmless, we AFFIRM the convictions. Because the district court improperly sentenced Haines and Porter based upon the conspiracy-wide drug quantity, we VACATE their sentences and remand the case to the district court for resentencing of Haines and Porter. Because the district court did not plainly err in sentencing Iturres-Bonilla, we AFFIRM his sentence.

## I.

In October 2010, the DEA began investigating a New Orleans drug dealer named Marc Guyton. Officer Ricky Jackson testified that he made roughly ten undercover purchases of heroin from Guyton between November 2010 and April 2011. In March 2011, the DEA began tracking Guyton's calls and texts. In April 2011, the DEA also began tracking Haines's calls and texts. Over the next several months, the government began surveilling two other members of the drug ring, Harry Berry and Terrance Henderson. This surveillance produced much of the evidence presented at trial.

No. 13-31287

DEA Task Force Agent Demond Lockhart was the key government witness at trial. According to his trial testimony, Guyton called Haines in April 2011 and, using "code" phrases, expressed his desire to buy heroin from Haines. Guyton was returning from an unsuccessful attempt to buy heroin in St. Louis. In code, Haines agreed to sell a sample of heroin to Guyton. After this phone call, GPS tracking indicated that Guyton went to the block of Haines's home. After midnight, Guyton texted Haines to begin negotiating the price of heroin.

Guyton also texted an individual identified as "Nick," one of his heroin customers. Guyton told Nick he wanted Nick to "check something out," which, according to Lockhart, indicated that Guyton wanted someone to test a sample of heroin. Later that day, Guyton called Haines and said that "it's good, I'm going to get that from you," as long as Haines "[m]ake[s] sure it's that same thing right there." According to Lockhart, this exchange was Guyton's confirming to Haines that Guyton would purchase heroin so long as it was the same as the sample. Guyton asked Haines to let him know "the ticket," *i.e.*, the price, and to "[c]heck on the half also," meaning a half-kilogram of heroin.

Later that day, Guyton texted Haines and said, "just one quarter of crawfish; don't f—k with the one half." According to Lockhart, "crawfish" was a code term for heroin; the text message was changing the order from a half-kilogram to a quarter kilogram. Haines responded that he would "see what Cajuns got." Lockhart testified that "Cajuns" was Guyton's term for the person from whom he would buy heroin. Haines sent a follow-up text stating that "Cajuns" would let him know about the order later. At noon, Haines texted Guyton that "Cajuns don't have no mo crawfish." The only person Haines had talked to on the phone that morning, other than his two girlfriends, was Harry Berry.

3

No. 13-31287

After the "Cajuns" exchange, Guyton texted Haines and asked, "That's all you had?" Haines responded affirmatively. Guyton responded to Haines, "D—n, Knowledge," which is Guyton's nickname for Haines. Haines replied, "I know, bruh, we need to go to Afghanistan." Lockhart testified that over 75% of the world's opium comes from Afghanistan, and opium is used to make heroin.

That same day, Haines called Guyton and the two of them discussed the quality of the heroin that Haines had given to Guyton, apparently in response to a negative review that another distributor had given Guyton of the sample provided by Haines. Guyton and Haines arranged to meet, and indeed met that night at a gas station. Haines and Guyton drove separate vehicles to the gas station; Haines exited his vehicle and got into the passenger seat of Guyton's vehicle, then shortly thereafter exited Guyton's vehicle and returned to his own vehicle.

The government also presented extensive evidence of the involvement of appellant Raymond Terrell Porter, whose nickname was "T," in the drug ring. According to the testimony of co-conspirator McKenzie Weber, Porter had once sold nine ounces of heroin to Guyton in Guyton's Frenchman Street apartment. After buying the heroin, Guyton proceeded to "cut" it using a blender.

In May 2011, Porter called Guyton and Guyton responded that he was still at home. Guyton then called two of his heroin customers and asked them "to check something out." As noted above, according to Lockhart's testimony, this is the phrase Guyton uses with his customers to indicate he has a sample for them to try. The customer texted Guyton shortly thereafter, "Honestly, last s—t was better, Brah." That night, Guyton called a co-conspirator, Dorian Goins, and discussed the variances they had noticed in Porter's products. Approximately two weeks later, the New Orleans police department arrested

4

No. 13-31287

Guyton and found him in possession of 63 grams of heroin. After the arrest, Haines and Berry discussed it on the phone.

At this point, investigators believed that an apartment in Houston, Texas, that Berry and his associates called "the spot," was hosting drug transactions involving defendants. In early June 2011, Berry and Haines drove to Houston. Berry dropped Haines off at a mall and then went to "the spot." While in Houston, Berry repeatedly called Iturres-Bonilla's phone. During the drive, Berry also contacted Porter and, according to Lockhart, spoke in code that indicated Porter had not given Berry enough money.

After Berry and Haines returned to New Orleans, the investigators put surveillance on Berry. Berry drove from Haines's residence to the home of Ruffin Moye, a codefendant. Moye came outside, entered Berry's vehicle, and then exited it again. The next day, police checked Moye's trash and found plastic with heroin residue on it and black tape. It was inside a plastic bag that looked as if it had been washed out. The police followed Moye, saw him conduct heroin sales, and arrested him.

Several days later, Berry made another trip to "the spot." The following day, on the way back, Berry stopped at Porter's brother's residence for 25 minutes. After leaving the residence, Berry stopped a block or two away and discarded a white plastic bag containing plastic wrap and black electrical tape. Berry then went to Porter's residence.

In July, Berry took another trip to "the spot." On the way there, he stopped at Haines's residence and on his way back, he stopped at Haines's residence again. After remaining there for an hour, Berry and Haines left in Berry's truck. Berry stopped his truck around the corner, and Haines exited the vehicle threw away a bag in a trash bin. Investigators discovered that the bag contained plastic wrap and black electrical tape, and it tested positive for heroin residue.

5

No. 13-31287

Beginning in mid-July, the government intercepted numerous phone calls between Iturres-Bonilla and Henderson and between Iturres-Bonilla and Berry. On July 15, Berry and Iturres-Bonilla spoke on the phone. Iturres-Bonilla asked, "How everything going with you?" Berry responded, "Ain't too much, slow but sure," which Lockhart testified was code for steady heroin business. Iturres-Bonilla also said, "I got a little situation," which Lockhart testified was a problem with his heroin trafficking.

In a July phone call with Henderson, Iturres-Bonilla discussed dealing with the money Henderson had previously given him, as well as problems with his heroin suppliers. Iturres-Bonilla also assured Henderson that the heroin business would "pick up."

The following day, in a phone call between Berry and Henderson, Henderson referred to Iturres-Bonilla (whose voice can be heard on the call) as Berry's "partner." The three of them discussed the heroin business in New Orleans using code phrases relating to cars and auctions. The next day, Berry and Iturres-Bonilla continued talking about the drug trade using the "auction" codes. Near the end of the call, Iturres-Bonilla stated, "we're going to go ahead and get some other lines, okay?" Lockhart testified that this was an instruction to get new telephones.

Henderson called Iturres-Bonilla several days later and asked him whether he kept a "skillet" at "the spot"; a skillet is a device used to cut heroin. Several days after that, investigators heard Henderson discussing his plans for collecting money from his dealers in New Orleans and the fact that his supplier had more heroin available. Henderson then went to New Orleans and met with several known heroin dealers. The following day, in Houston, Iturres-Bonilla's vehicle was spotted in the parking lot of "the spot" next to Henderson's vehicle. Iturres-Bonilla was then stopped by the police in a traffic

6

stop.  During the traffic stop, he gave the police a fake ID in the name of Ramsey Crespo.

In mid-August, Berry again went to "the spot."  When returning through Baton Rouge, Berry was stopped by Louisiana police on a traffic violation.  A search of Berry's car revealed a secret compartment containing 999 grams of heroin wrapped in black electrical tape.

In November, investigators arrested many of the coconspirators and executed searches on multiple residences and other properties.  DEA agent Vincent Saltaformaggio testified that he helped execute a search warrant on Iturres-Bonilla's residence in Richmond, Texas, and also had an arrest warrant for Iturres-Bonilla.  According to Saltaformaggio, during the search, Iturres-Bonilla ran outside from the garage and threw a metal press over the fence into a neighbor's yard.  The metal press, which is commonly used by drug dealers to compress drugs, contained 405 grams of heroin wrapped in clear cellophane.

Inside the garage, investigators found a garbage can containing a bag with $89,000 in cash.  The residence contained a Colombian passport in Iturres-Bonilla's name and two Texas ID cards in the name of Ramsey Crespo.  The Crespo ID cards displayed a picture of Iturres-Bonilla.  In and near the sink were cellophane wrapping in soapy water and black tape, both of which Saltaformaggio testified were commonly used to wrap heroin.  Saltaformaggio also testified that investigators had found similar wet cellophane wrapping when doing "trash pulls."[1]  Specifically, a July trash pull relating to Haines and Berry had yielded similarly wet cellophane wrapping.

---

[1] A "trash pull" is the term for searching the trash after a suspect has been observed discarding trash.

No. 13-31287

The same day, Saltaformaggio also searched "the spot," which he described as "torn up" and lacking any indication that people lived there, such as clothing or personal items. Saltaformaggio also testified that he observed the red pickup truck from Iturres-Bonilla's residence near the apartment building on a past occasion.

Iturres-Bonilla's girlfriend took police to his safe deposit box. The safe deposit box contained copies of a Colombian passport, copies of a Colombian National ID card, and a Puerto Rican birth certificate. The Colombian documents all bore Iturres-Bonilla's name and picture. The birth certificate bore the name Ramsey Fabian Crespo Morales. The safe deposit box also contained jewelry that was later appraised at $97,000.

DEA agent Derrick Conn conducted the search on Henderson's Houston residence. During the search, Conn found 710 grams of heroin, $9,700 cash, and eight cell phones. Lockhart executed the search warrant on Berry's house. The search uncovered $40,000 in cash in a closet and receipts for another $20,000 of expenditures. Agent Marc Webber searched Porter's home. Although Porter had not reported income for 2008–2011, his residence included granite countertops, large televisions, and over fifty boxes of shoes. Porter stated that he was flat broke. Agent Jules Martin led the search of Haines's residence. There, police located $924 in the pants he was wearing and $2,000 in the pocket of a jacket in his closet. They also found a bottle of mannitol, a dietary supplement used for cutting heroin. Finally, they found five cell phones in the house. A search of two residences belonging to Guyton uncovered a large press, a .223 caliber rifle, and 114 grams of heroin.

No. 13-31287

## II.

The grand jury returned a 28-count indictment against Haines, Porter, Iturres-Bonilla, and eleven other defendants.[2]  In the Second Superseding Indictment, Haines, Porter, and Iturres-Bonilla were charged with conspiring to possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) and knowingly or intentionally using a communications facility in committing that violation, in violation of 21 U.S.C. § 843(b).

At trial, the government relied on extensive testimony from Lockhart. He testified both in his role as the case agent and also as an expert witness on drug code.[3]  Lockhart testified that he had worked on drug investigations for eleven years and had listened, through court-ordered phone taps, to "well over 100,000" phone calls including discussion of heroin or other illegal drugs.  He testified that through his experience, he had learned to interpret the coded language drug dealers use to describe their products and activities.  The government moved to qualify Lockhart as "an expert in drug code."

The defendants cross-examined Lockhart to determine if he was properly qualified as an expert in drug code.  On cross-examination, Lockhart testified that he had not taken courses on drug code and that he was aware of no such courses.  Lockhart also testified that he had not written articles on interpreting drug code, nor had he taught any classes, although he had instructed other individuals on interpreting drug code.  He testified that he had participated in hundreds of narcotics investigations and had been the lead agent on eight of those investigations.

---

[2] Ten other defendants pleaded guilty before trial, while the eleventh was a fugitive until after the conclusion of this trial.

[3] Our cases and those of our sister circuits use the phrases "jargon," "code," "lingo," and "slang" interchangeably.  We use the phrase "drug code" here, but discern no substantive difference between this term and the other terms.

No. 13-31287

After hearing the defendants' objections to Lockhart's being certified as an expert in drug code, the district court accepted him as an expert, stating:

> I am going to accept Agent Lockhart as an expert in the field of drug jargon. I think his training and experience in drug investigations, and clearly there was numerous investigations involving the use of code words and slang by drug traffickers establishing and qualifying him to testify as an expert in this specialize[d] area. It's unlikely that, without his testimony, the jury would be able to understand the recorded conversation which feature a certain amount of slang or coded language.

The district court called back the jury and instructed it on the importance of distinguishing between Lockhart's expert testimony and his fact testimony. Specifically, the district court directed:

> The following witness, Agent Lockhart, will testify both as an expert witness and as a fact witness. An expert witness offers an opinion on certain matters based upon special knowledge, skill, experience, training or education. Such witnesses may only render an opinion in their particular field of expertise. And, in this case, the particular field of expertise is drug code. So it's only in that area that he is allowed to offer his opinion. A fact witness, on the other hand, testifies exclusively as to the facts that were personally experienced or observed by that witness. Regardless of [the] capacity in which Agent Lockhart testifies, you should evaluate his testimony as you would any other witness. That is, you should assess Agent Lockhart's credibility as a witness and give his testimony as much or as little weight as you believe it deserves.

Lockhart proceeded to testify at length about the phone calls between the defendants and their co-conspirators. Most of this testimony was not objected to by the defense. According to Lockhart's testimony, he listened to a phone call between Haines and Guyton in which Guyton asked, "You got some pictures over there?" He testified as an expert that "pictures is a code word that heroin traffickers use to describe samples or smaller portions of heroin, representative samples of a larger portion of heroin." No defendant objected

10

to this testimony.  Likewise, no defendant objected when Lockhart testified that an April 3, 2011, phone conversation between Haines and Guyton used language masking drug references.  Nor did any defendant object when Lockhart testified to an April 3, 2011, text message from Guyton to Haines; Lockhart testified that the reference to crawfish in the statement, "Just one quarter of crawfish; don't f—k with the one half," was drug code.  Later interpretations of "crawfish" and "seafood" as heroin were likewise not objected to.

Lockhart also described a text message exchange between Guyton and Haines as being about heroin purchasing.  On a recorded phone call Haines stated, "Put that with that."  Lockhart testified that this was a reference to comingling two quantities of heroin.  No party objected to Lockhart's testifying on the meaning of this phrase.  Lockhart also repeatedly testified that "Cajuns," the name of a restaurant, was a code word for a source of heroin.  No party objected to this testimony.

There were some instances in which the defendants objected.  Lockhart testified that the word "that" in a text message stating "I know you can do that for me for 21, ha," was used as a code phrase for heroin.  The defense objected on the grounds that "that" was plain English, not drug jargon.  The defense argued that "[Lockhart] has been qualified as an expert.  However, now, he is saying that he believed the word 'that' was referring to . . . specifically some drug. . . . this is not a matter of code, jargon or linguistics; this is purely speculation about what a pronoun is in reference to, and that's what the jury's got to determine."  The district court overruled the objection, telling the prosecution, "you can do that, what's 'that' mean.  I think it's appropriate for [Lockhart] to tell us in the context of this text [message] what 'that' is referring to.  And I'm going to allow."  Referencing the same text message, the district

11

No. 13-31287

court explained that "I'm going to allow him to testify as an expert in narcotic drugs, drug code, with the context of this text message."

In another exchange, the defense lodged a speculation objection to Lockhart's testifying about the context behind a text message. The objection was overruled and the following exchange took place:

Q [Prosecutor]: Agent Lockhart . . . is [the exhibit] a text message, and who is that from?

A [Lockhart]: This text massage occurred at 7:16 a.m. on April 3, 2011. It's a text message from Marc Guyton to an individual he referred to as Nick.

Q: Did you, as the case agent, have the opportunity to investigate and find out who the person Nick is?

A: As we identified, Nick is one of Marc Guyton's heroin customers.

Q: Could you read the text to the jury.

A: Text message says: Nick, I need you to check something out for me; call me ASAP.

Q: Is there any code in that text message?

A: When Marc Guyton uses the two words 'check something,' when he uses the phrase 'check something out,' he's referring to [a] heroin sample that he wants one of his customers to test.

Q: How did you form that opinion?

A: Listening to all of Marc Guyton's telephone calls when he's speaking with his heroin customers.

Lockhart also testified about an intercepted call on April 3, 2011, as follows:

Q: Is there any drug code in this call?

A: Yes. When Marc Guyton says: 'What you going to do, man.' He's asking Clarence Haines if he's followed through with acquiring the total package of heroin that he requested from him on the following -- on the previous date. Clarence Haines says: 'Waiting on the word for you.' He means that I was waiting on you to call me and tell me that it was okay for me to follow through. When he,

12

Guyton, says: 'Yeah, it's good, I'm going to get that from you.' When he says 'it's good,' he's letting Clarence Haines know that the heroin sample-tested out good and that he wanted to get it, get the total package of heroin from him. Also . . . Marc Guyton says: 'Make sure it's that same thing right there.' He's telling Clarence Haines to make sure that the total package of heroin that he supplies is identical to the sample that he received from him on the previous date.

Later, after reading a portion of a call transcript in which Haines says "we need to go to Afghanistan," Lockhart testified as an expert that that was a reference to Afghanistan's being a major source of heroin. The court overruled an objection to that testimony as well. When Lockhart testified that "no news is good news" had meaning as drug code, the district court overruled the defense's objection. The defendants also objected to Lockhart's testifying about statements from Houston because they claimed he had been admitted as an expert only on New Orleans drug slang. The court overruled that objection.

At other times, the court sustained objections that were related to the scope of Lockhart's testimony: when Lockhart speculated about the meaning of a text message based on his own knowledge of other factual circumstances that had happened around the same time; when Lockhart was asked to speculate about the identity of a person referenced in a text message; when Lockhart interpreted "main man" to refer specifically to Porter (the court said it was the jury's province to draw that conclusion); and when Lockhart attempted to recount the contents of a difficult-to-hear audio track that had been played for the jury.

In total, during the nine-day trial, the government played or displayed approximately 100 calls and texts, submitted 113 exhibits into evidence, and presented the testimony of 22 witnesses. The jury convicted each defendant on both counts and found that the conspiracy involved one kilogram or more of heroin.

No. 13-31287

## III.

Defendants' challenges to the sufficiency of the evidence rely in large part on their claims that Lockhart was improperly permitted to testify as an expert. Accordingly, before addressing their sufficiency challenges, we examine whether Lockhart's testimony was proper. At trial, Lockhart provided extensive testimony regarding wiretapped conversations and intercepted text messages among defendants and other co-conspirators. Defendants argue the district court erred in two respects regarding Lockhart's testimony: (1) the district court improperly permitted Lockhart to testify as an expert under Federal Rule of Evidence 702 on the topic of drug code; and (2) the district court improperly permitted Lockhart to testify on matters that were beyond the scope of his expertise. Defendants properly preserved both of these arguments by objecting at trial. We review preserved objections regarding the admission of expert or lay testimony for abuse of discretion, subject to harmless error analysis.[4] *United States v. Akins*, 746 F.3d 590, 597 (5th Cir.), *cert. denied*, 135 S. Ct. 189, *and cert. denied*, 135 S. Ct. 467, *and cert. denied*, 135 S. Ct. 707, *and cert. denied*, 135 S. Ct. 707 (2014).

## A.

Defendants first argue that Lockhart should not have been qualified as an expert under Rule 702 at all. Under Rule 702, expert testimony is permissible if the expert is qualified "by knowledge, skill, experience, training,

---

[4] As the government points out, defendants failed to object at trial to many of the specific instances of Lockhart's testimony which they now challenge. Defendants argue that objections would have been futile, noting that the district court twice instructed defense counsel to "stop beating that dead horse" when they continued to object to Lockhart's testimony. We need not decide whether further objections would have been futile, although we note that the district court granted some of defendants' subsequent objections to Lockhart's testimony. However, because we address Lockhart's testimony by category rather than examining each specific statement and because we find that any errors were harmless, we will review all of defendants' evidentiary challenges under the more generous abuse of discretion standard for the sake of simplicity.

14

or education" to render his opinion. Fed. R. Evid. 702. Rule 702 further requires that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.* If a "witness testifies as both a fact witness and an expert witness in the same trip to the witness stand . . . the government and the court must take some special precautions to make clear for the jury when the witness is relying on his expertise and when he is relying only on his personal knowledge of the case." *United States v. York*, 572 F.3d 415, 421 (7th Cir. 2009).

We have "recognized that in the context of drug conspiracies, '[d]rug traffickers' jargon is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony.'" *Akins*, 746 F.3d at 599 (quoting *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997)). Our sister circuits have also "consistently upheld the use of expert testimony to explain both the operations of drug dealers and the meaning of coded conversations about drugs." *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2002); *see also, e.g.*, *United States v. Freeman*, 498 F.3d 893, 901–02 (9th Cir. 2007) (holding that expert's testimony on "interpretation of encoded drug jargon was admissible"); *United States v. Ceballos*, 302 F.3d 679, 686 (7th Cir. 2002) (holding that DEA agents with extensive drug investigation experience were properly qualified as experts in drug code). Because "drug dealers often camouflage their discussions" with code words, "expert testimony explaining the meanings of code words may 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Dukagjini*, 326 F.3d at 52 (citing Fed. R. Evid. 702).

No. 13-31287

The district court properly qualified Lockhart as an expert under Rule 702 based on his extensive experience as a drug investigator. Under Rule 702, a witness may be qualified as an expert based upon "knowledge, skill, experience, training, or education." We have never required formal educational credentials to qualify a witness as an expert, and even "the advisory committee notes to Rule 702 state that experience in the field can be the predominant, if not the sole, basis for expert testimony in some cases." *Ceballos*, 302 F.3d at 686. Defendants engaged in extensive *voir dire* of Lockhart before the district court, and they do not argue that they were not given adequate opportunity to challenge his credentials. Lockhart had been a drug investigator for over eleven years. During that time, he authored over fifty Title III (wiretap) affidavits and was the lead investigator in seven or eight investigations. He also testified that he has listened to "well over 100,000" wiretapped phone calls in his career. *Cf. Griffith*, 118 F.3d at 322–23 (holding that law-enforcement witness was qualified to give expert testimony about drug dealers based on her "eight-and-one-half years as a DEA agent" and participation in 50 investigations). Lockhart explained that while he had never published papers or taught formal classes on drug code, these types of formal educational opportunities are not common in the field because formal rules of interpretation would lead conspirators to change their tactics and undermine investigators' ability to interpret their conversations. Lockhart did, however, have experience informally instructing other investigators in drug code interpretation. Based on Lockhart's extensive knowledge, skills, and experience, the district court did not err by qualifying him as an expert.

**B.**

Defendants next argue that Lockhart's testimony went beyond the scope of his expertise. We agree, in part. Lockhart's testimony falls into three broad categories. He testified about: (1) the "coded" meaning of specific words and

16

terms commonly used in the drug trade; (2) the meaning of specific words and terms used by the particular defendants in this case; and (3) the meaning, in context, of exchanges using common words such as "what," "she," "that," and "stuff." As we will explain, testimony in category (1) was permissible expert testimony; testimony in category (2) was not permissible as expert testimony, but was admissible as lay opinion testimony; and testimony in category (3) was impermissible. In addition, with respect to category (2), the district court failed to guard against conflation of lay and expert testimony. However, we also conclude that the district court's errors with respect to Lockhart's objected-to testimony were harmless.

### 1.

We begin with the portions of Lockhart's testimony that were properly admitted as expert testimony. In *Griffith*, the district court permitted a DEA agent to testify that "days of work" was code for "pounds of marijuana," that "30" meant "$30,000," and that "5 price" meant $500 per pound. 118 F.3d at 322. We observed that "[j]urors as well as judges often need help in deciphering the jargon of those engaged in the drug trade." *Id.* at 321 (citation omitted). We had previously "allowed law officers to testify to the 'argot or seemingly secret jargon' used in drug money laundering. . . . [and saw] no reason the same principle should not apply to drug traffickers as well as their bankers." *Id.* at 321–22 (citation omitted).

Much of Lockhart's testimony was proper under *Griffith*. In particular, Lockhart's testimony about drug code that has consistent meaning in the narcotics trade and would be unknown to a lay person was permissible expert testimony. For instance, Lockhart testified that "ticket" is a word commonly used in the narcotics trade to reference price; "taxing" refers to overcharging a customer for heroin; "hitter" is a term for the phone that drug dealers use to contact their customers; "at my hat" meant "trying to collect money"; and

"picture" is commonly used to refer to a small sample of heroin. Lockhart testified that "based on [his] experience with narcotics, when a person is not able to sell a lot of drugs or is not profiting from selling drugs, they say they're suffering from starvation. The opposite of starvation is eating . . . [s]o if you are profiting from selling drugs and if you are doing well in the drug game, you're eating." Based on this, Lockhart explained that Haines's reference to his supplier's "not being hungry anymore" was Haines's communicating that "[o]nce his supplier 'eats,' he's satisfied." Lockhart also testified about Haines's text message to Guyton, which stated that "we need to go to Afghanistan." Lockhart testified that "[b]ased on information that [he had] received from [his] law enforcement career, [he was] aware that over 75 percent of the world's opium is produced in Afghanistan. They use opium to produce morphine, and heroin comes from morphine. So, when Clarence Haines referenced going to Afghanistan, he's telling Marc Guyton that that's the place we need to go to obtain the quantities of heroin that we want." All of this testimony was properly admitted as expert testimony under Rule 702.

**2.**

**a.**

Turning to the second category of testimony, Lockhart also testified about the meaning of specific words and terms used by the particular defendants in this case (but not necessarily in the drug trade generally). For example, Lockhart testified that when [co-conspirator] Barry said "you know I'll be up there as soon as I can," the phrase "I'll be up there" is a reference to Houston, Texas. He also testified that Barry uses the phrase "as soon as I can" "to inform Bonilla that as soon as he's [Barry] done distributing heroin he'll be up there." Lockhart also testified that when Haines sent messages saying "I know you can do that for me for 21, ha," and "that's all I had," the word "that" was code for "heroin." Lockhart further testified that "What you going to do,

man?" was drug code for "asking Clarence Haines if he's followed through with acquiring the total package of heroin that he requested from him on the . . . previous date." This testimony was not based on Lockhart's expertise with the drug trade writ large; rather, this testimony is based on his familiarity with this particular case.

We have recognized that this type of testimony is "within the proper ambit of a lay witness with extensive involvement in the underlying investigation." *Akins*, 746 F.3d at 599. Where an "agent's 'extensive participation in the investigation of [the] conspiracy, including surveillance . . . and the monitoring and translating of intercepted telephone conversations, allow[s] him to form opinions concerning the meaning of certain code words used in this [specific] drug ring based on his personal perceptions," lay opinion testimony is proper. *Id.* (quoting *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001)). "[E]xplaining the meanings of terms as used in the conversations and documents, as well as the relationships between the people [the agent is] investigating . . . provide[s] the jury with relevant factual information about the investigation." *Id.* (quoting *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011)).

In *Akins*, we held that where the witness decoded specific phrases and explained the basis for his opinion as to their meaning, his lay opinion testimony was proper. *Id.* at 600. The law enforcement agent testified that he knew that "three zones" was code for "three ounces" "because he heard the speakers on the intercepted calls use the terms interchangeably [and] that a 'nine' referred to nine ounces of cocaine because the quoted price was consistent with that amount in the investigation . . . and '[he knew] from the search and seizure that [a 'bi'] is approximately 4–1/2 ounces of crack cocaine.'" *Id.* at 600 n.15 (third alteration in original); *see also United States v. Macedo-Flores*, 788 F.3d 181, 192 (5th Cir. 2015) ("Although [an FBI agent's] experience as a law

No. 13-31287

enforcement officer may have allowed him to testify as an expert, our case law also allows him to testify to his lay opinion regarding the meaning of code words used in an investigation for which he is the lead investigator."), *petition for cert. filed* (Sept. 2, 2015) (No. 15-5947); *Miranda*, 248 F.3d at 441 (holding that lay witness could testify to "the meaning of certain code words used in this drug ring based on his personal perceptions").

When Lockhart testified that "picture" and "camera" were drug code, he also bolstered that opinion with testimony that the GPS tracking device on Guyton's cell phone indicated that Guyton had just returned from St. Louis, Missouri when he placed that particular call. Thus, Lockhart was relying on both his experience interpreting drug code and his first-hand knowledge of the investigation. Lockhart also testified about an exchange between Guyton and Terry Thompson, one of Guyton's heroin customers. Guyton told Thompson that he had something for Thompson, and Thompson later responded that "I did a little over half of it and it was weak." Lockhart testified that this exchange was Guyton getting Thompson to sample a batch of heroin and report on its quality and strength. This testimony is lay opinion under Rule 701 because it is based upon Lockhart's personal knowledge of the investigation. Similarly, Lockhart's testimony that "half" in the phrase "check on the half" referred to a quantity of heroin was based on his knowledge of the previous quantities of heroin that Guyton had purchased. Therefore, it would have been admissible as lay opinion testimony under Rule 701 even if Lockhart were not also an expert on drug code.

**b.**

Although Lockhart's testimony in the second category was admissible as lay opinion testimony under Rule 701, it was nevertheless admitted in error in some instances, because the district court did not adequately differentiate between Lockhart's lay and expert testimony.

No. 13-31287

In *Dukagjini*, the Second Circuit identified four special concerns that arise when case agents testify in a dual capacity as experts and lay witnesses. 326 F.3d at 53 ("While expert testimony aimed at revealing the significance of coded communications can aid a jury in evaluating the evidence, particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case."). First,

> when a fact witness or a case agent also functions as an expert for the government, the government confers upon him the aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use. This aura creates a risk of prejudice because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial, a risk that increases when the witness has supervised the case. Simply by qualifying as an "expert," the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge. Additionally, when the expert bases his opinion on in-court testimony of fact witnesses, such testimony may improperly bolster that testimony and may suggest to the jury that a law enforcement specialist believes the government's witness to be credible and the defendant to be guilty, suggestions we have previously condemned.

326 F.3d at 53 (internal citations, quotation marks, and modifications omitted).

"Second, expert testimony by a fact witness or case agent can inhibit cross-examination." *Id.* Impeaching an expert is generally difficult because the expert usually has impressive credentials, and an expert opinion is less easily contradicted than a factual matter. *Id.* Because a failed effort to impeach the witness as expert may bolster his credibility as a fact witness, "a defendant may have to make the strategic choice of declining to cross-examine the witness at all." *Id.*

21

No. 13-31287

Third, "when the prosecution uses a case agent as an expert, there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities, deviating from the strictures of Rules 403 and 702." *Id.* at 54 (citing *United States v. Simmons*, 923 F.2d 934, 946–47 n.5 (2d Cir. 1991)). The *Dukagjini* court noted the need for testimony interpreting drug code to be "closely monitored by the district court" to avoid letting the agent usurp the jury's function and improperly summarize an investigation by others that is not part of the record. *Id.*

Fourth, a failure to clearly distinguish between fact and opinion testimony is likely to confuse the jury. "Some jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case. When the witness is a case agent who testifies about the facts of the case and states that he is basing his expert conclusions on his knowledge of the case, a juror understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility." *Id.*

Other circuits have likewise noted these four concerns and the need for courts and the government to carefully distinguish between an agent's dual roles. *E.g.*, *Freeman*, 498 F.3d at 903 ("We share the concerns expressed by the Second Circuit in *Dukagjini*."); *United States v. Garcia*, 752 F.3d 382, 391–92 (4th Cir. 2014) ("Despite the district court's careful attention to [a special agent's] credentials as a decoding expert, however, we hold that the agent's testimony was fraught with error arising from the problems the district court itself identified early in the trial: the conflation of [the agent's] expert and fact testimony, particularly her reliance on her knowledge of the investigation to support her coding interpretations; her failure to apply her methodology

22

reliably; and last, her failure to state on the record an adequate foundation for very many of her specific interpretations."); *York*, 572 F.3d at 425 (although law enforcement officers are often permitted to testify as both fact and expert witness, "there are some inherent dangers with this kind of dual testimony," including risk of jury confusion, undue weight being given to fact testimony because of "aura of special reliability," and undue weight being given to opinion testimony because of perception that the officer was privy to facts not presented at trial).

The district court in this case recognized the problems arising from the dual nature of Lockhart's testimony. Notwithstanding the court's instruction to the jury at the outset of Lockhart's testimony, which accurately described his dual role, the distinction largely disappeared over the course of Lockhart's extensive direct examination. After denying multiple objections and requests for limiting instructions, the court eventually agreed that a limiting instruction was needed, noting that "very frankly, we're going in and out [between expert and fact testimony], and it becomes very problematic." The court then instructed the jury that:

> [Y]esterday, when Agent Lockhart had been called, I indicated to you that he had been offered and accepted by the Court as an expert in the field of drug code or decoding some of the terminology, and that he would be testifying as an expert witness as well as a fact witness. As to the testimony you've just heard regarding identification of various phone numbers, you should be informed that that was fact testimony as related to facts that he's personally aware of but not an expert in that opinion.

After another hour of testimony, the court again correctly recognized that Lockhart's purported expert testimony had strayed from a principled application of specialized knowledge and experience. In response to an objection, the court stated: "I think the problem is using [Lockhart] now as a

transcript and he's not decoding.  He's just telling us what it said."  The court then reminded the jury "that the evidence in this case is the actual tape."

These instructions were certainly helpful but may have been insufficient to mitigate the potential for confusion or prejudice caused by the government's failure to adequately distinguish between Lockhart's fact and opinion testimony.  Safeguards sufficient to ensure that a witness's dual role does not prejudice or confuse a jury "might include requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *Garcia*, 752 F.3d at 392 (finding that a cautionary instruction was insufficient to mitigate the potential for prejudice where the court had represented to the jury that the government would be clear in its questions whether it was asking for fact or opinion testimony, and the government failed to do so); *York*, 572 F.3d at 425 ("[D]istrict courts must take some precautions to ensure the jury understands its function in evaluating this evidence.  The jury needs to know when an agent is testifying as an expert and when he is testifying as a fact witness.") (internal citation omitted) (finding error where district court did not "flag for the jury when [the agent] testified as a fact witness and when he testified as an expert"; agent's testimony switched back and forth between expert experience and knowledge of the particular investigation at issue; and the government's framing of questions asked agent to rely on both expert opinion and knowledge of the investigation at the same time); *see also Dukagjini*, 326 F.3d at 56 ("Although we decline to prohibit categorically the use of case agents as experts, we note that the Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to

ensure that it is reliable and not substantially more unfairly prejudicial than probative.") (internal citation omitted).

The government's questions and Lockhart's testimony interpreting the wiretapped phone calls in this case frequently failed to distinguish between Lockhart's opinion testimony based on his years of experience investigating drug crimes and his fact testimony based on his knowledge of the particular conspiracy at issue in the case. This "le[ft] the jury to wonder who was testifying, [Lockhart]-the-expert or [Lockhart]-the-case-agent." *York*, 572 F.3d at 426. Where Lockhart offered fact testimony about the meaning of certain words or phrases used in this conspiracy but not in the broader drug trade, without explaining the basis of interpretation, the government and the court did not adequately clarify for the jury that this was lay testimony. As a result, some of Lockhart's fact testimony, which would otherwise have been admissible based on his personal knowledge of the investigation, was admitted in error.

Nonetheless, any error here was harmless[5] because the record—even excluding those portions of Lockhart's testimony in which his role was unclear—is replete with evidence that all three defendants participated in the conspiracy. *See* Part IV, *infra.*

**3.**

Turning to the third category of testimony, Lockhart also testified about the meaning, in context, of exchanges using common words such as "what," "she," "that," and "stuff." This testimony was impermissible. Federal Rule of Evidence 701 provides:

---

[5] As noted above, we are reviewing all of defendants' evidentiary challenges for abuse of discretion subject to harmless error, notwithstanding their failure to object at trial to some of the statements they now challenge.

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"[L]ay opinion testimony is permitted under Rule 701 because it has the effect of describing something *that the jurors could not otherwise experience for themselves* by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013) (emphasis added) (citation omitted). Testimony on topics that the jury is fully capable of determining for itself is not "helpful to clearly understanding the witness's testimony," Fed. R. Evid. 701, and therefore is inadmissible under Rule 701.

In *Freeman*, 730 F.3d at 598, the government offered lay opinion testimony from an FBI agent that included interpreting "the situation is over with" by explaining that "[t]he situation discussed was regarding [the victim] and his having stolen jewelry from [the defendant], [the defendant] having put a hit on [the victim] and [the victim] ultimately being killed." The Sixth Circuit cautioned that "a lay opinion should not waste time" or "merely tell the jury what result to reach," and that "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *Id.* at 597. "[A] case agent testifying as a lay witness may not explain to the jury what inferences to draw from recorded conversations involving ordinary language." *Id.* at 598. The court held that the agent's testimony was improper because it "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.* at 597 (citing *United States v. Peoples*, 250 F.3d 630, 640 (8th Cir. 2001) (finding that the agent's "testimony was not limited to coded, oblique

language, but included plain English words and phrases" and was therefore inadmissible under Rule 701)). *But see United States v. Ceballos*, 302 F.3d 679, 688 (7th Cir. 2002) ("[W]e hold that the district court did not abuse its discretion in permitting [special agents] to offer expert testimony on the meaning of pronouns such as 'it' and 'them' because the pronouns were used in an ambiguous manner and because of the agents' vast experience with drug code language."); *United States v. Gadson*, 763 F.3d 1189, 1210 (9th Cir. 2014) ("Because a jury may become confused by vague pronouns such as 'who,' 'him,' and 'that,' [an officer's] testimony would provide helpful context" and district court did not plainly err by admitting it).

Similarly, in *United States v. Grinage*, 390 F.3d 746, 748–49 (2d Cir. 2004), a DEA agent testified that several intercepted phone calls using the phrases "I need something bad, bad, bad," and "I need about nearly four," were drug-related "based on [his] knowledge of the entire investigation" and "because of his knowledge of [the defendant's] activities." The court held that this testimony was improper as lay opinion because it "usurped the function of the jury to decide what to infer from the content of the calls." *Id.* at 750. The court warned that under this approach "there would be no need for the trial jury to review personally any evidence at all. The jurors could be 'helped' by a summary witness for the Government, who could not only tell them what was in the evidence but tell them what inferences to draw from it. That is not the point of lay opinion evidence." *Id.*; *see also United States v. Hampton*, 718 F.3d 978, 986 (D.C. Cir. 2013) (Brown, J., concurring) ("A lay opinion witness may tell jurors 'what was in the evidence,' but not 'tell them what inferences to draw from it,' for that responsibility is up to the jury and the jury alone.") (citing *Grinage*, 390 F.3d at 750). Such a usurpation of the jury's function by a government agent is especially concerning because "[a]n agent presented to a jury with an aura of expertise and authority increases the risk that the jury

will be swayed improperly by the agent's testimony, rather than rely on its own interpretation of the evidence." *Freeman*, 730 F.3d at 599; *see also Grinage*, 390 F.3d at 751 (same). *But see Gadson*, 763 F.3d at 1209 ("Contrary to the rationale of *Hampton* and *Grinage*, 'the application of Rule 701 should not be influenced by concern that opinion testimony usurps the role of the jury or that factual testimony is more reliable than opinion testimony.'") (quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6252, at 112 (1997)).

In this case, when Lockhart testified to the meaning of common words like "what," "she," "that," and "stuff," he was offering his own interpretation of language that was well within the province of the jury to interpret. The same is true with respect to Lockhart's testimony as to the meaning of pronouns such as "that" and "it," and his testimony that "as soon as I can" was a reference related to heroin. At another point, the government introduced an exchange between Haines and Guyton in which Haines says, "I wanted to bring him that s—t, too" "from last night." Lockhart testified that he "determined that the . . . s—t that [Haines] wanted to bring him back was the heroin that he provided to Marc Guyton on the previous night. Or, the money from that heroin, he wanted to bring that to his heroin supplier when was finished." This testimony was admitted in error because it went beyond Lockhart's expertise and personal knowledge of the investigation and instead ventured into speculation, usurping the jury's function, which is to draw its own inferences from the evidence presented. Furthermore, Lockhart was presented to the jury "with an aura of expertise and authority," *Freeman*, 730 F.3d at 599, which arose not only from his status as the case agent but also because of his extensive experience in investigating other drug crimes, increasing the risk that his testimony would improperly sway the jury.

No. 13-31287

Nevertheless, Lockhart's interpretation of common words constituted only a small fraction of his extensive testimony. As discussed below, there was sufficient evidence to sustain the defendants' convictions apart from Lockhart's improper testimony, and the error was therefore harmless.

## IV.

All three defendants challenge the sufficiency of the evidence for their convictions. Review of the sufficiency of the evidence is very deferential to the jury verdict.

> We review a challenge to the sufficiency of the evidence supporting a conviction by reviewing all evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. In determining whether there is sufficient evidence to support a verdict, this court asks only whether the jury's decision was rational, not whether it was correct. We must accept all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict. The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.

*United States v. Lewis*, 774 F.3d 837, 841 (5th Cir. 2014) (internal quotation marks and citations omitted). None of the defendants can overcome this exacting standard of review. All of the defendants' convictions are supported by evidence that would allow a rational fact-finder to find all of the elements of the offenses.

"In a drug conspiracy prosecution, the Government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to violate narcotics law; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement." *United States v. Hayes*, 342 F.3d 385, 389–90 (5th Cir. 2003). "A conviction under § 843(b) requires proof that a defendant (1) knowingly or intentionally

(2) used a communications facility (3) to facilitate the commission of a drug offense." *United States v. Mankins*, 135 F.3d 946, 949 (5th Cir. 1998) (emphasis omitted).

Haines contends that there was insufficient evidence to show that he was involved in a heroin conspiracy. His argument is premised on our excluding Lockhart's testimony in its entirety. As we have explained, much of Lockhart's testimony was properly admitted and the portions of the testimony admitted in error were harmless in light of the other evidence presented. Even without the objectionable parts of Lockhart's testimony, there is ample evidence from which a reasonable jury could find Haines guilty beyond a reasonable doubt of conspiracy to possess with intent to distribute a kilogram of heroin. Haines was arrested in March 2011 for possession of heroin with intent to distribute. Haines spoke with the other members of the conspiracy. Although Haines did not visit "the spot" himself, Haines met with Guyton on multiple occasions and accompanied Berry on his trip to Houston. Berry met with Haines before and after his July trip to "the spot," and Haines discarded a bag of trash containing heroin refuse. When Haines's house was searched, investigators found a large amount of cash, a bottle of mannitol, and five cell phones. The portions of Lockhart's testimony that were proper provide still further support for the jury verdict. Haines did not object to numerous of Lockhart's statements interpreting certain messages to be related to heroin (for example, the "crawfish" messages of April 3), and Lockhart also testified that Haines spoke with Guyton on the phone regarding the "ticket," or the price of heroin. All in all, there is more than enough evidence in the record for a rational jury to conclude that Haines knowingly joined a heroin conspiracy.

Haines's conviction for use of a telephone in facilitating a drug conspiracy is likewise supported by sufficient evidence. Even discounting the objectionable parts of Lockhart's testimony, there still was ample evidence in

the record. The government presented evidence of numerous text messages and calls between Haines and Guyton. Lockhart testified—permissibly—that many of the phone calls and text messages included discussion of selling heroin using code language. Moreover, even without direct testimony about the content of the calls, there was ample evidence with which a rational jury could conclude, based on the number and timing of the communications, and the cryptic and vague language used, that these phone calls and text messages were in furtherance of the conspiracy. And with the admission of the permissible aspects of Lockhart's testimony, there is even more evidence to support a finding that the Guyton-Haines calls and texts were in furtherance of the drug conspiracy. In sum, ample evidence supports the jury verdict.

Porter's challenge to the sufficiency of the evidence is primarily based on his assertion that a rational jury could not conclude beyond a reasonable doubt that he was "T." "T" was the nickname of one of the conspiracy participants, and much of Porter's connection to the case depends upon whether that nickname refers to Porter. Porter asserts that there are other people who could potentially be nicknamed "T" in this case, including Terrence or an unknown entity. Because all of the inculpatory evidence relies on his being "T," according to Porter, the evidence is insufficient to convict him if the jury could not have rationally found that he was "T."

Be that as it may, there are at least two bases on which a rational jury could have inferred that Porter was "T." First, McKenzie Weber identified Porter as "T."[6] Porter did not object to Weber's repeated assertion that he was "T," and a rational jury might find credible Weber's testimony that Porter's

---

[6] Weber testified that he bought drugs from Guyton, who bought them from Porter. On cross-examination, Weber admitted that he had not actually seen Porter on the night in question when Guyton bought heroin from "T," and that he had never interacted with Porter personally or been around him talking, but maintained that "I know him just seeing him."

nickname is "T." Second, in one call, Guyton refers to "T" as having brought "little B, . . . his step son" to Guyton's residence, and Porter does have a stepson whose name begins with a "B."

Although Porter attacks Weber's testimony and the reasonableness of referring to a teenage boy as "little B," these facts are sufficient for a rational fact-finder to infer that Porter is "T." *See United States v. Cannon*, 750 F.3d 492, 506 (5th Cir. 2014) (noting that we review the evidence "in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict.") (citation omitted). Because a rational jury could have inferred that Porter was "T," a rational jury could have inferred that Porter joined the conspiracy. As Porter admits in his brief, it would have been reasonable for a jury to infer that the "T" referenced as Guyton's "main man" is the same "T" who sold Guyton heroin during the sale described by Weber. Once the references to "T" are inferred to be references to Porter, there is more than enough evidence for a rational jury to convict. "T" sold heroin to Guyton, was his "main man" (supplier), and had been the subject of Guyton's complaints regarding heroin quality.

Porter also contends that the evidence was insufficient for the jury to find that his June 12 call to Berry was in furtherance of the conspiracy, meaning his conviction for using a communications facility to facilitate a drug offense would have to be reversed. Porter contends that because the phone call was just benign sports talk and an agreement for Berry to come over before the game's start time of 7:00 p.m., Porter could not have been "facilitating the commission" of a drug conspiracy under § 843(b). In light of the deferential standard of review, we cannot say that there was insufficient evidence for the jury to convict. The government produced evidence that Porter's arranging to meet at 7:00 p.m. was for the purpose of getting heroin from Berry. The

No. 13-31287

evidence established that Berry was on his way back from "the spot." Right before going to Porter's residence, Berry discarded heroin packaging. Berry went to Porter's house at 4:30 p.m., well in advance of the game, and stayed for four minutes. That evidence was sufficient to allow the jury to find that the meeting arranged over the call was for a heroin drop-off, which would mean Porter used a phone to facilitate the drug conspiracy. Sufficient evidence supports Porter's conviction on both counts.

Iturres-Bonilla challenges the sufficiency of the evidence for his conspiracy conviction because, according to him, the government failed to prove a sufficient nexus between him, Harry Berry, and Terrance Henderson. However, there was sufficient evidence for the jury to find beyond a reasonable doubt that Iturres-Bonilla was part of the conspiracy. When his home was searched, he attempted to discard 405 grams of heroin that was in a press designed to compact the powder. In addition to the press and the heroin, investigators found cellophane wrapping and black electrical tape that was commonly used to wrap heroin. The phone records indicate that Iturres-Bonilla was in frequent contact with Berry and Henderson, including conversations that used coded language to obfuscate the calls' nature relating to drug trafficking. Contrary to Iturres-Bonilla's assertions, the record is replete with evidence tying him to Berry and Henderson. His challenge to the sufficiency of evidence on that point is rejected, and the conviction is affirmed.

## V.

Iturres-Bonilla argues that the district court erred when it declined to permit him to call DEA agent Violet Szeleczky as a witness. Szeleczky was one of the DEA agents in charge of investigating the case. When Iturres-Bonilla's lawyer learned that Szeleczky had been cited for poor judgment by the DEA in 2000, the government informed him that it would not be calling Szeleczky as a witness. Iturres-Bonilla's lawyer stated that he intended to call Szeleczky

33

anyway to elicit statements from her and then use her disciplinary record to impeach her. The district court instructed Iturres-Bonilla's lawyer that he could not call a witness just to impeach her, but could call Szeleczky for factual testimony and then, *if she gave inconsistent testimony*, could impeach her. The district court also stated that Iturres-Bonilla could impeach Szeleckzy if he established that she was hostile. However, the district court warned that it would not allow Iturres-Bonilla to call her solely to impeach her.

Iturres-Bonilla argues that the district court improperly "held that a party can't impeach his own witness." He contends that the district court stated he could impeach Szeleczky only if the government called her as a witness. This, according to Iturres-Bonilla, was a violation of his right to present a complete defense and a violation of his right to confrontation because Szeleczky was a significant witness. Iturres-Bonilla is correct that a party may impeach his own witness. Fed. R. Evid. 607 ("Any party, including the party that called the witness, may attack the witness's credibility."). Moreover, evidence that one of the DEA agents involved in the investigation and arrest of Iturres-Bonilla had been disciplined for poor judgment may have contributed to Iturres-Bonilla's defense. *See United States v. Scheffer*, 523 U.S. 303, 329 n.16 (1998) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal citations and quotation marks omitted). However, Iturres-Bonilla's argument fails because the district court did not actually prohibit him from calling Szeleczky. In any event, Iturres-Bonilla did not raise a Confrontation Clause or Due Process objection before the district court and cannot satisfy the plain error standard.

No. 13-31287

## VI.

Haines and Porter argue that the district court erred by imposing a 20-year mandatory minimum sentence. According to Haines and Porter, the district court erroneously based the mandatory minimum on the conspiracy-wide quantity of heroin, rather than on the quantities attributable to each of the defendants individually. The government agrees with Haines and Porter that the relevant quantity *should* be the quantity attributable to each individual defendant, but nevertheless believes it is constrained by our precedent, which it believes makes conspiracy-wide quantity the relevant metric. Because it is undisputed that the jury did not make an individualized quantity finding with respect to either Haines or Porter, and because such findings are necessary to increase their mandatory minimum sentences, we vacate their sentences and remand for re-sentencing.

Sentencing in a conspiracy case involves two distinct sentencing ranges: the statutory range of punishment and the Sentencing Guidelines range. The statutory range acts as an outer boundary; a defendant cannot be sentenced below the statutory minimum or above the statutory maximum, even if the Guidelines recommend a term of imprisonment outside of that statutory range. Title 21 U.S.C. § 841 controls the statutory range of punishment for the defendants in this case. As we have explained,

> Section 841 consists of two relevant subsections. Section 841(a) makes it unlawful for any person to manufacture or distribute a controlled substance. Section 841(b) defines the applicable penalties for violations of § 841(a) based on the type and quantity of drug, previous convictions, and whether death or serious bodily injury resulted from use of the drug.

*United States v. Doggett*, 230 F.3d 160, 164 (5th Cir. 2000). The factual determination regarding the quantity of the controlled substance can "significantly increase[] the maximum penalty from 20 years under

35

No. 13-31287

§ 841(b)(1)(C) to life imprisonment under § 841(b)(1)(A)," *id.*, and it can significantly increase the minimum penalty from zero years under § 841(b)(1)(C) to ten years under § 841(b)(1)(A).[7]  In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013), the Supreme Court held that factual determinations that increase maximum or minimum sentences, other than a prior conviction, must be found by a jury beyond a reasonable doubt (or admitted by the defendant).  Because the quantity of heroin involved affects Haines's and Porter's minimum sentences under § 841, it must be found by a jury.  *See Alleyne*, 133 S. Ct. at 2155 ("Mandatory minimum sentences increase the penalty for a crime.  It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury.").

The question we must address in this case is whether the relevant quantity for purposes of determining a mandatory minimum is the quantity attributable to the entire conspiracy or the quantity attributable to the individual defendant.  We hold that Haines and Porter should have been sentenced based on the drug quantity attributable to them as individuals, not the quantity attributable to the entire conspiracy.

The relevant facts of Haines's and Porter's sentencing are laid out below.

**A.**

The district court calculated Haines's criminal-history score as six, which put him in Criminal History Category III.  Haines's offense level for the drug-conspiracy charge was 34.  With a criminal-history category of III and a base offense level of 34, the Sentencing Guidelines gave a suggested range of 188–235 months' imprisonment.  The presentence report (PSR) recommended a

---

[7] Section 841(b)(1)(C) applies generally to schedule I controlled substances including heroin, but § 841(b)(1)(A) applies if the violation involves 1 kilogram or more of a mixture or substance containing heroin.

sentence of 240 months, however, because 21 U.S.C. § 841(b)(1)(A) mandates a 20-year minimum if, *inter alia*, the offense involved one kilogram or more of heroin and the defendant "commits such a violation after a prior conviction for a drug felony offense." Because Haines had a prior felony drug conviction and the jury found that "the overall scope of the conspiracy involved 1 kilogram or more of heroin," the PSR recommended applying the statutory minimum.

Haines filed 13 objections to the PSR. In his written objections, he challenged specific facts in the PSR as being outside the evidence presented to the jury or inconsistent with that evidence. After filing his initial objections, Haines submitted a sentencing memorandum. He "object[ed] to any and all enhancements or increases of any kind to his sentence based on facts other than those decided by the jury or admitted by the defendant," and cited *Apprendi* and *Alleyne*. At the sentencing hearing, the district court denied all of Haines's objections. Haines's attorney stated that he "would reurge the objection with regard to the mandatory minimum and . . . would direct the Court's attention to a federal case, [*United States v. Gurrusquieta*, 54 F. App'x 592 (5th Cir. 2002)]." Haines's attorney stated that "just because there was a conviction for a certain amount does not automatically trigger the mandatory minimum sentences found in Section 841(a)(1), but for sentencing purposes the defendant is only accountable for all of the quantities of marijuana [sic] [with] which he was directly involved." The district court overruled that objection, stating that "Mr. Haines was found by a jury of 12 that he was guilty of participating in a conspiracy beyond a reasonable doubt and the jury specifically found that it included a kilogram of heroin." Because of that, the district court held that the statutory minimum applied. The court sentenced Haines to 240 months' imprisonment on count one and 48 months' imprisonment on count two, to run concurrently.

No. 13-31287

The district court calculated Porter's criminal-history score as five, which put him in Criminal History Category III. The PSR calculated his base offense level at 34 and, as with Haines, the PSR stated that the 20-year statutory minimum applied because of a past felony drug conviction and the jury finding that the offense involved one kilogram or more of heroin.

Porter filed six objections to the PSR. In Objection No. 5, Porter challenged the portion of the PSR which stated that the mandatory minimum sentence of 240 months applied to him:

> Paragraph 176 of the PSI states ". . . in accordance with USSG § 5g1.1(C)(2), the applicable advisory guideline range is 240 months." According to [*Alleyne*], which was decided one month following the trial in the above referenced matter, "any fact that increases mandatory minimum sentence for crime is 'element' of crime, not 'sentencing factor,' that must be submitted to jury." The Sixth Amendment requires that each element must be proven beyond a reasonable doubt. Porter objects to this classification because the jury did not deliberate on facts that increase the mandatory minimum sentence.[8]

At sentencing, the district court overruled Porter's objections. Porter's attorney reiterated his objection and explained that the numbers in the PSR were mostly reached by conjecture. He stated that the only quantity his client was alleged to have "physically touched" was eight ounces. The court overruled the objection as moot because the statutory minimum would override any guidelines range reached by the PSR calculations. The defendant himself then stated that his own conduct did not amount to three to ten kilograms of heroin; the PSR, he asserted, was attempting to sentence him for the whole conspiracy. The district court explained that the statutory minimum overrode the

---

[8] The only facts in Porter's case that increased the mandatory minimum were the quantity of the heroin attributable to him and his prior conviction. *Apprendi* and *Alleyne* do not require jury findings for prior convictions, so Porter's challenge necessarily went to the drug quantity.

No. 13-31287

guidelines calculations, agreed to note Porter's objection, and sentenced Porter to 240 months' imprisonment on count one and 48 months' on count two, to run concurrently.

Although Haines and Porters' objections before the district court did not identify the precise issue they now raise on appeal with an ideal level of specificity, they were sufficient to put the district court on notice of their challenge and preserve the objections on appeal. "Preserved challenges to sentences, whether inside or outside the guidelines range, are reviewed for abuse of discretion." *United States v. Torres-Perez*, 777 F.3d 764, 767 (5th Cir. 2015).

**B.**

For purposes of the Guidelines or for determining statutory minimum and maximum sentences, our cases always have limited the defendant's liability to the quantity of drugs with which he was directly involved or that was reasonably foreseeable to him. For example, in *United States v. Quiroz-Hernandez*, 48 F.3d 858 (5th Cir. 1995), *as modified on reh'g* (May 8, 1995), we explained:

> Under the Sentencing Guidelines, a defendant who participates in a drug conspiracy is accountable for the quantity of drugs, which is attributable to the conspiracy and reasonably foreseeable to him. Reasonable foreseeability does not follow automatically from proof that the defendant was a member of the conspiracy. Reasonable foreseeability requires a finding separate from a finding that the defendant was a conspirator. Thus, for a sentencing court to attribute to a defendant a certain quantity of drugs, the court must make two separate findings: (1) the quantity of the drugs in the entire operation and (2) the amount which each defendant knew or should have known was involved in the conspiracy.

*Id.* at 870 (citations, quotation marks, and alteration omitted); *accord United States v. Brito*, 136 F.3d 397, 415 (5th Cir. 1998); *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994). Of course, *Apprendi* and *Alleyne* require the

39

No. 13-31287

jury (rather than the court) to determine "the amount which each defendant knew or should have known was involved in the conspiracy," but that finding still must be made.

In light of this longstanding rule, we have found error where the district court increased a statutory minimum in reliance on a conspiracy-wide quantity of drugs. In *United States v. Guajardo*, we reiterated that "[f]or sentencing purposes, a defendant is accountable only for the drug quantity with which he was directly involved, and all reasonably foreseeable quantities of marijuana within the scope of the joint criminal activity." 391 F. App'x 384, 386 (5th Cir. 2010) (internal quotation marks omitted). We held that even though Guajardo pleaded guilty to a conspiracy involving more than five kilograms of cocaine and 500 grams of a mixture of methamphetamine, the district court erred by applying a 10-year statutory minimum because the PSR "determined that the drug quantity attributable to Guajardo was the equivalent of 300.51 kilograms of marijuana[, which was less] than the threshold quantity (1,000 kilograms of marijuana) necessary for triggering the 10-year statutory minimum penalty." *Id.* Likewise, in *Gurrusquieta*, we noted that a defendant's conviction for conspiring to distribute in excess of 1,000 kilograms of marijuana did not automatically trigger the 10-year mandatory minimum because "a defendant is only accountable for all quantities of the marijuana with which he was directly involved, and all reasonably foreseeable quantities of marijuana that were within the scope of the criminal activity that he jointly undertook." 54 F. App'x 592, at *3. "In other words, an individual convicted of conspiring to distribute at least 1,000 kilograms of marijuana . . . is not necessarily subject to the ten-year minimum. Only if the defendant is responsible for at least 1,000 kilograms, as determined by the Sentencing Guidelines, does the mandatory statutory minimum apply." *Id.* (finding no plain error because defendant's sentence fell within the applicable Guidelines range).

40

## No. 13-31287

In its brief, the government agrees with the defendants that "at least [as] to imposing a mandatory minimum, . . . the sentence should be based on a 'defendant-specific approach' – a finding as to the type and quantity of drugs that can be attributed to the individual defendant by his personal conduct and reasonable-foreseeability of co-conspirator conduct." According to the government,

> [a]t the time of sentencing, the government advocated [that] both mandatory minimums and statutory maximums were controlled by the jury's conspiracy-wide finding. After defendants were sentenced, the Department of Justice shifted its policy, urging that mandatory minimum sentences in drug conspiracy cases should be determined by a jury's defendant-specific finding, in light of *Alleyne*.

However, at oral argument the government cautioned that the rule for drug quantity findings that increase the mandatory minimum should be the same as the rule for drug quantity findings that increase the statutory maximum— and the government suggests that our precedent in *United States v. Turner*, 319 F.3d 716 (5th Cir. 2003), requires a finding as to the conspiracy-wide quantity for purposes of the statutory maximum.[9] That is a bridge we need not cross today. We simply hold that, for purposes of statutory minimums at sentencing, the relevant quantity is the quantity attributable to the individual defendant. In this case, the jury did not make any findings about the drug

---

[9] Last year, relying on *Turner*, we explained that the government's burden at trial in a drug conspiracy case "does not extend to the 'individualized question of what drug quantity was attributable' to a particular defendant as a co-conspirator. The Government 'need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum *for the conspiracy as a whole.*'" *Akins*, 746 F.3d at 607 (quoting *Turner*, 319 F.3d at 722). Like *Turner*, *Akins* addressed statutory sentencing *maximums*. We also reemphasized in *Akins* our well-established rule that "a defendant will not necessarily be held responsible for the full amount of drugs involved in the conspiracy, but rather only those amounts of drugs that he knew or reasonably could have known or believed were involved in the conspiracy, considering the co-conspirator's role in the conspiracy, his relationship to the other conspirators, and any other information with sufficient indicia of reliability." *Id.* (citation and internal quotation marks omitted).

No. 13-31287

quantities attributable to Haines or Porter, and we accordingly vacate their sentences and remand for re-sentencing.

**VII.**

Iturres-Bonilla claims that the district court erred by imposing a sentence above the statutory maximum. According to Iturres-Bonilla, he should have been sentenced with a statutory maximum of 20 years, but the district court erroneously applied a statutory maximum of life imprisonment (and sentenced him to 292 months' imprisonment) based on the conspiracy-wide quantity of heroin, rather than based on an individualized quantity finding. This issue is similar to the one addressed *supra* with respect to Haines and Porter; the difference is that whereas Haines and Porter argued that their *minimum* was set incorrectly, Iturres-Bonilla claims that his *maximum* was incorrectly set. Unlike Haines and Porter, however, Iturres-Bonilla did not preserve his objection to the use of conspiracy-wide findings, and he cannot prevail on plain error review.

Iturres-Bonilla made 25 objections to the PSR. Several of these objections were factual corrections, and several others were objections to statements that implied he was guilty. Iturres-Bonilla's other objections mostly concerned the PSR's calculation of drug quantities. His most detailed objection was Objection No. 14, in which he criticized the PSR's drug quantities as "based on guesswork, sheer speculation or grossly insufficient information." The objection also stated:

> At trial, the defense maintained that Mr. Iturres-Bonilla was responsible for less than one kilogram of heroin. The jury concluded otherwise. For appellate purposes and for the purpose of these objections, the defense maintains that Mr. Iturres-Bonilla was responsible for less than one kilogram of heroin. Mr. Iturres-Bonilla should be held responsible for no more than 405.6 grams of heroin. His base offense level should be 28.

42

No. 13-31287

This objection, and its reference to the "base offense level," is an objection to the Guidelines calculation, not to the applicable statutory maximum. Because Iturres-Bonilla failed to object to the use of a conspiracy-wide quantity to set the statutory maximum, we review for plain error. There are four requirements for plain error review:

> (1) there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned; (2) the legal error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights; and (4) if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc) (citation and internal quotation marks and alterations omitted). Iturres-Bonilla has not argued, much less proven, that he can prevail under that standard, and we therefore reject his challenge to the applicable statutory maximum.

Iturres-Bonilla raises three other challenges to the calculation of his recommended sentence under the Sentencing Guidelines. We review de novo the district court's Guidelines interpretations and review for clear error the district court's findings of fact. *United States v. Miller*, 607 F.3d 144, 147 (5th Cir. 2010).

First, Iturres-Bonilla claims that the district court erred in determining his Guidelines range. In calculating Iturres-Bonilla's Guidelines range, the district court determined that Iturres-Bonilla was responsible for between three and ten kilograms of heroin as part of the conspiracy. This triggered a base offense level of 34. USSG 2D1.1(c)(3). At sentencing, the court made several factual findings in support of this quantity. Harry Berry made three

No. 13-31287

trips (June, July, and August 2011) to "the spot" and retrieved heroin to be distributed in New Orleans.  Following the June trip, Berry discarded an empty package containing heroin residue that was consistent with having contained half a kilogram of heroin.  Following the July trip, Berry discarded two such empty packages.  Following the August trip, Berry was arrested with one kilogram of heroin in his possession, which he had retrieved from "the spot," where Iturres-Bonilla supplied heroin.  These trips account for 2.5 kilograms of heroin.

When Iturres-Bonilla was arrested in November 2011, he was found in possession of 405.6 grams of heroin and $89,437 cash.  Although the district court did not explicitly state that she found the cash to have a heroin equivalent, Lockhart had testified at sentencing that $89,000 was equivalent to roughly two kilograms of heroin, and Iturres-Bonilla does not appear to deny the district court actually held that the $89,000 was part of the calculation.  The district court did not err in converting the cash into a drug quantity.  Under § 2D1.1, the court may approximate the quantity of the controlled substance if "the amount seized does not reflect the scale of the offense."  USSG § 2D1.1 cmt. n.5.  Converting the money seized from a drug defendant into its equivalent amount of drugs is not clear error.  *United States v. Henderson*, 254 F.3d 543, 544 (5th Cir. 2001).

It is true that, as Iturres-Bonilla points out, Lockhart later stated that $40,000 could purchase half a kilogram of heroin, which would mean that $89,000 could purchase only a little more than one kilogram.  This inconsistency is immaterial, however, because the cash had to account only for 94.4 grams of heroin, so whether the district court adopted the one-kilogram or two-kilogram conversion, it more than sufficed to push the total to at least three kilograms.  Accordingly, the district court did not err in calculating the

44

No. 13-31287

amount of heroin attributable to Iturres-Bonilla for purposes of the guidelines calculation.

Second, Iturres-Bonilla claims that the district court erred by applying a four-level sentencing enhancement for being an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). Specifically, the court found that the evidence at trial established that Iturres-Bonilla was "a source of supply of the heroin for Berry and Henderson," he "directed Berry and Henderson to 'the spot' where the heroin was to be retrieved," and he "directed them to switch telephones to avoid detection." Iturres-Bonilla also "further directed Berry and Henderson to move more heroin." Iturres-Bonilla objected to this enhancement in his response to the PSR.

A trial court's finding that a defendant is a leader or organizer is a factual finding reviewed for clear error. *United States v. Gonzalez*, 436 F.3d 560, 584 (5th Cir. 2006). A court's factual finding is clearly erroneous "only if, based on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed." *Akins*, 746 F.3d at 609 (citation omitted). Iturres-Bonilla contends that the district court clearly erred because his "tone is not one of a leader, but of a partner." Rather than directing his co-conspirators to get new cell phones, he merely stated that, "We're going to go ahead and get some other lines, okay?" He also notes that Berry and Henderson could access the stash house whenever they wanted.

Iturres-Bonilla has not carried his burden to show clear error. The district court's interpretation of the "other lines" comment as imperative is plausible. In addition, although Iturres-Bonilla cites *United States v. Betancourt*, 422 F.3d 240, 245 (5th Cir. 2005), for the proposition that being a supplier of drugs does not automatically render that person a leader or organizer, that case actually supports the district court's finding. A person's

45

status as a distributor in a drug conspiracy is relevant in determining both "the degree of participation in planning or organizing the offense" and "the nature and scope of the illegal activity." *Id.* (quoting USSG § 3B1.1 cmt. n.4). In light of all this, the district court did not clearly err in finding that Iturres-Bonilla was a leader or organizer of the conspiracy.

Third, Iturres-Bonilla argues that the district court erred in applying a two-level sentencing enhancement because Iturres-Bonilla "maintained a premises for the purpose of manufacturing or distributing a controlled substance." USSG § 2D1.1(b)(12). Iturres-Bonilla objected to the imposition of this enhancement. The district court overruled the objection, finding that Iturres-Bonilla had maintained "the spot" for the purpose of making heroin transactions, as evidenced by Berry's trips there to receive heroin and the lack of food, clothes, and personal items found when officers searched "the spot." The thrust of Iturres-Bonilla's argument on appeal is that "the spot" was not just for drug transactions, but was more generally maintained to be a safe meeting place. He does not appear to be challenging the conclusion that he maintained the premises.

A district court's application of § 2D1.1(b)(12) is a factual finding reviewed for clear error. *See United States v. Barragan-Malfabon*, 537 F. App'x 483, 484–85 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 716 (2013) (district court did not clearly err in determining that a primary use of the home was the storage of controlled substances for distribution purposes); *United States v. Chagoya*, 510 F. App'x 327, 328 (5th Cir. 2013) ("[Defendant-Appellant] has not shown that the district court clearly erred in assessing him an increase in offense level under § 2D1.1(b)(12)."). The district court did not err. The Sentencing Guidelines specify that "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises." USSG

§ 2D1.1 cmt. n.17.  The district court made factual findings, supported by the record, showing that one of the main purposes for the apartment was drug distribution.  Iturres-Bonilla has not shown how the district court's decision was erroneous.  His sentence is affirmed.

For the foregoing reasons, we AFFIRM the defendants' convictions and Iturres-Bonilla's sentence, VACATE Haines's and Porter's sentences, and REMAND the case to the district court for resentencing of Haines and Porter.